MOBIL OIL CORPORATION, Petitioner,

v.

FEDERAL POWER COMMISSION,
Respondent.

No. 75–2267.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 21, 1977.

Decided Jan. 3, 1978.

Carroll L. Gilliam, Washington, D. C., with whom Philip R. Ehrenkranz, Craig W. Hulvey, Washington, D. C., Robert D. Haworth and Roscoe C. Elmore, Houston, Tex., were on the brief for petitioner.

Thomas M. Walsh, Atty., Federal Power Commission, Washington, D. C., with whom

Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel and Allan Abbot Tuttle, Sol., Federal Power Commission, Washington, D. C., were on the brief for respondent.

Before TOM CLARK,* Retired Associate Justice of the Supreme Court of the United States, MacKINNON and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

Mobil Oil Corporation petitions under Section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r, for review of two orders issued by the Federal Power Commission. In the first order the Commission denied in part Mobil's application in 1975 to amend two certificates which the Commission had issued to Mobil in 1972. *Mobil Oil Corp.,* Nos. CI72–530 & –578 (Sept. 19, 1975). The second order denied Mobil's request for a rehearing. *Mobil Oil Corp.,* Nos. CI72–530 & –578 (Nov. 19, 1975). Because we think the Commission in both orders acted arbitrarily, we vacate the orders and remand the case to the Commission with directions.

The amendments which Mobil seeks concern four contracts between Mobil, a natural gas producer, and Texas Eastern Transmission Corporation, an interstate gas distributor. In 1971 Texas Eastern agreed to make advance payments to Mobil to assist Mobil's financing of certain wells it held in offshore Louisiana. In return Mobil agreed to sell Texas Eastern 50 percent of the gas produced if the reserves in the wells exceeded 400,000,000 thousand cubic feet (mcf), or 60 percent of the gas produced if the reserves were between 150,000,000 and 300,000,000 mcf. In 1972 the companies implemented this agreement by executing two gas sales contracts and an exchange and transportation contract. The major contract signed in 1972, a long-term (20-

---

* Mr. Justice Tom C. Clark, United States Supreme Court, Retired, sitting by designation pursuant to 28 U.S.C. § 294(a). Justice Clark heard oral argument in this case but died thereafter and did not participate in the final decision.

year) sales contract, obligated Mobil to sell and Texas Eastern to buy one-half of the gas reserves in the wells. However, in accordance with the 1971 agreement, the sales contract further stipulated that the amount of reserves was to be redetermined [1] and that if they were found to be less than 400 million mcf, Texas Eastern would be entitled to 60 percent of the production.[2]

The other 1972 sales contract, a short-term (4-year) agreement, was concluded because of Texas Eastern's need for gas to reduce immediate curtailments of its gas deliveries. In this agreement Texas Eastern promised to buy and Mobil to sell at 32¢ per mcf the following percentages of the gas production not committed under the long-term contract: 98 percent in 1972; 70 percent in 1973; 50 percent in 1974; and 20 percent in 1975. Therefore, as a result of the two 1972 sales contracts, Texas Eastern was entitled to the bulk of the gas to be produced from the wells during 1972 to 1975, the term of the shorter agreement. For example, Texas Eastern got under the long-term contract 50 percent of the total 1972 production and under the short-term contract it acquired 98 percent of the remaining one-half of the 1972 production, or a total of 99 percent of the 1972 production. The companies also entered into an exchange and transportation agreement requiring that Texas Eastern transport the portion of the uncommitted gas intended for Mobil's use. The three 1972 agreements were made in reference to each other as well as in reference to the 1971 agreement.

Mobil and Texas Eastern then applied to the Commission for certificates authorizing the sales and transportation specified in the contracts. *See* 15 U.S.C. § 717f. In its application regarding the long-term agreement, Mobil sought a sales price of 26¢ per mcf, at that time the area national rate prescribed by the Commission. With respect to the short-term contract, Mobil asked for a higher price of 32¢ per mcf, the contract rate. Mobil submitted as part of its applications the two sales contracts, which it offered as the rate schedules for the certificates.

The Commission consolidated Mobil's and Texas Eastern's applications with other applications asking approval of transactions in which interstate pipelines had agreed to transport gas for the producers' own use in return for a percentage of the gas produced. *See Tennessee Gas Pipeline Co.,* Nos. CP 72–6, *et al* (May 30, 1972). This consolidated proceeding promised to be drawn out because numerous retail gas distributors, as intervenors, objected to these financing arrangements. The ground of the objections was that by permitting the producers to retain more gas the arrangements reduced the amount of gas available for retail. *Id.*

Seeking to expedite certification of their applications Mobil and Texas Eastern moved to sever their applications from the consolidated docket, and proposed a settlement. The Commission's staff convened a settlement conference, and the parties agreed to a revised offer of settlement. In addition to recommending severance, the offer proposed that the Commission issue the certificates but with two conditions: that the percentage of gas sold to Texas Eastern under the short-term contract be increased to 98 percent of Mobil's uncommitted production for all four years; and that Mobil be restricted in the ways it could use the gas transported by Texas Eastern for Mobil's own purposes.[3]

On August 4, 1972 the Commission approved the motion for severance and the offer of settlement. *Tennessee Gas Pipeline Co.,* Nos. CP 72–6, *et al* (August 4, 1972), at A 140. The Commission found the

---

1. The redetermination was to be made either 30 days before initial delivery or 30 days after the next federal drainage sale, whichever came last.

2. The 1972 long-term sales contract did not specify the 60 percent figure but merely provided that if the reserves were redetermined to be below 400 million mcf, Texas Eastern's share would be that set forth in section 2.1 of the 1971 advance payments agreement. Section 2.1, in turn, specified 60 percent.

3. Mobil was to be limited in use of this gas to replacement of feedstocks and energy requirements at its Jefferson County, Texas complex.

settlement offer and the issuance of certificates to be in the public interest. *Id.* at A 145. Accordingly it ordered that the certificates be granted and designated the sales contracts as the respective rate schedules for the certificates. *Id.* at A 148–149. In addition to approving the two conditions in the settlement, the Commission imposed another condition: during emergencies the gas transported for Mobil's use could be diverted to essential services on Texas Eastern's system. *Id.* at A 148.

In 1974, after performance under the contracts had begun, two events occurred which gave rise to the controversy here. In June 1974 the Commission increased the area national rate from 26¢ to 51¢ per mcf. Opinion No. 699, 51 FPC 2212. Pursuant to a national rate escalation clause in the long-term contract, the price of gas sold under that agreement was raised from 26¢ to 51¢ per mcf. Therefore the price under the long-term contract rose above that under the short-term contract, which was pegged at 32¢ per mcf. Then in December 1974 Mobil and Texas Eastern, pursuant to contract, redetermined Mobil's reserves. The redetermination established that the original estimate of 400 million mcf was too high and that the reserves were below 300 million mcf. The contracts were accordingly amended effective January 1, 1975: Texas Eastern's share of Mobil's production under the long-term contract was raised to 60 percent; and the uncommitted gas production, of which 98 percent was Texas Eastern's under the short-term contract, as amended by settlement, was concomitantly reduced to 40 percent. The effect of the amendments in 1975, the last year of the short-term contract, was thus to shift the sale of 10 percent of Mobil's 1975 production from the short-term contract to the higher priced long-term contract. The effect after 1975 was to raise Texas Eastern's share of Mobil's production from 50 to 60 percent, representing an increase of 20 percent.

Pursuant to Section 7 of the Act, Mobil applied to the Commission to amend its certificates to reflect the contract amendments. No one protested or petitioned to intervene in the matter. On September 19, 1975 the Commission denied Mobil's application to amend the short-term contract, approved the application to amend the long-term contract, but postponed the effectiveness of this amendment to January 1, 1976, the date the short-term contract expired. *Mobil Oil Corp.* Nos. CI72–530 & –578 (Sept. 19, 1975). The order thus delayed the increase under the long-term contract until after expiration of the short-term contract, negating the shifting of gas from the short-term contract to the higher priced long-term contract. The Commission reasoned that its established policy prohibited a producer from switching pricing mechanisms when a higher price to consumers resulted.

Mobil's petition for rehearing was denied on the ground that the 10 percent shift from the short-term to the long-term contract was inconsistent with the settlement agreement. *Mobil Oil Corp.,* Nos. CI72–530 & –578 (Nov. 19, 1975). The Commission in denying rehearing also noted that because no benefit accrued to the public, granting the application would not be in the public interest. Mobil then sought review in this court.

### I.

We consider first the Commission's construction of the settlement agreement. In its order denying rehearing, the Commission concluded that "under no possible interpretation" could the settlement permit Mobil to make the proposed changes in the percentages of gas. *Mobil Oil Corp.,* Nos. CI72–530 & –578 (Nov. 19, 1975), at A 183. The Commission's construction of the settlement was based apparently on a literal reading of that portion of the settlement offer stating:

> The Commission shall issue an order certificating the application filed by Mobil in Docket No. CI72–578 *providing for the sale to Texas Eastern of one-half of Mobil's interest* . . .

*Id.* at A 182 [Emphasis added]. In its brief to this court and at argument, the Commis-

sion continued to adhere to this literal construction.[4]

■ We conclude, however, that interpreting the quoted statement literally is unreasonable. Our reading of the language makes clear that the reference to "one-half of Mobil's interest" was merely a shorthand description referring to the general scope of the long-term contract. At the time of settlement 50 percent was Texas Eastern's share of Mobil's production under the long-term agreement, and one could not reasonably expect the parties to include in what was a terse summary the multitudinous clauses of this contract, especially one pertaining to a contingent condition.

■ Furthermore, our interpretation, unlike the Commission's, is consistent with the rules of contract construction and with the circumstances leading to settlement. *See Texas Gas Transmission Corp. v. F. P. C.,* 441 F.2d 1392, 1395 (6th Cir. 1971). If parties to a settlement intend to void earlier obligations like the redetermination clause here, they must employ some provision expressly doing so. As the Sixth Circuit concluded in construing a settlement, "[i]n contract law, silence is not generally taken as indicating an agreement between the parties unless the contract, taken as a whole, is an attempt to govern all relations between them . . .." *Id.* at 1396. The settlement here clearly was not intended to be an integrated instrument, and we refuse to infer from the settlement's silence on redetermination, that it purported to excise the earlier agreed-upon clause. Indeed, the 1972 contracts are detailed instruments imposing other obligations not delineated in the settlement, such as those concerning deliveries and additional volumes; yet, those duties—though unmentioned in the settlement—presumably remain binding and apparently are being performed.

The circumstances attending settlement, moreover, manifest that no party intended that the redetermination clause be struck. In fact, no party to the proceedings, objected to the long-term sales contract, the agreement which embodied the redetermination clause. Motion for Approval of Revised Settlement Offer, at A 124. The parties' concern was not with the redetermination clause or its implications; rather, each party sought expedited issuance of the certificates. Mobil, with no long-term gas supplies, desired prompt issuance for sound planning reasons, *id.* A 130–31; while Texas Eastern hoped for quick approval so that its levels of curtailments during 1972–73 would be reduced to a minimum. *Id.* at A 138. The intervenors, customers of Texas Eastern, must likewise have wanted early approval of the contracts. Their objection apparently was that the transportation agreement could result in less gas for retail distribution. *Id.* at A 124–25; *Tennessee Gas Pipeline Co.,* Nos. CP 72–6, *et al* (May 30, 1972), at A 120. Excising the redetermination clause, however, would have been contrary to the intervenors' interest as expressed in this objection, as well as to Texas Eastern's, for the clause gave Texas Eastern a greater percentage of gas and at a price which was very advantageous at the time of settlement. Thus, no concern about the redetermination clause was evident at the time of settlement, and had there been any, the parties' intentions would probably not have been to strike the clause, but to retain it.

Lastly, the irrationality of the Commission's construction of the settlement is demonstrated by the inconsistency in its orders. The Commission in its first order, while denying the motion to reduce the percentage under the short-term contract to 40 percent, approved the increase under the

4. In its brief, the Commission seeks to fortify its interpretation by noting that the settlement was approved by the Commission "on the basis of [Mobil's] explicit representation that [its] interests were 'at least 400 Billion cubic feet' ". Respondent's brief at P. 15. However, in the statement from which the Commission quotes, Mobil represented only "that the *present best* estimate of Mobil's interest . . . is at least 400 Billion cubic feet." A at 138. [Emphasis added] Moreover, this statement is not a ground for binding Mobil to the 50 percent figure in light of the express condition in the contract permitting escalation upon redetermination.

long-term contract to 60 percent although it delayed the effectiveness to January 1, 1976. Presumably this increase was approved on the basis of the redetermination. If, however, the settlement voided the redetermination clause, as the Commission theorizes in its second order and its brief here, no basis exists for its earlier approval of this delayed increase. Accordingly, we cannot agree with the Commission's construction of the settlement.

## II.

Because the redetermination clause was not voided by the settlement, it was incorporated by reference into the settlement, approved by the Commission in its order granting the application, and certificated as part of the rate schedule. *See* Revised Offer of Settlement, at A 137; *Tennessee Gas Pipeline Co.,* Nos. CP 72–6, *et al* (Aug. 4, 1972), at A 142, 147, 149. And because the Commission as party to the settlement was bound by it, *Texas Gas Transmission Corp. v. F. P. C.,* 441 F.2d 1392, 1394 (6th Cir. 1971); *see Tennessee Gas Pipeline Co. v. F. P. C.,* 164 U.S.App. D.C. 130, 133, 504 F.2d 199, 202 (1974); *Continental Oil Co. v. F. P. C.,* 373 F.2d 96 (10th Cir. 1967), the Commission must, at least in the absence of special circumstances, comply with the settlement and issue the amendments sought by Mobil.

We further conclude that no special circumstances warranting disapproval of Mobil's motion exist. The settlement and contracts, including the redetermination clause, were originally found by the Commission to be in the public interest. Mobil's subsequent application for amendment was unopposed. No suggestion has been made that Mobil fraudulently estimated its reserves initially as exceeding 400 million mcf, or that Mobil and Texas Eastern have fraudulently redetermined Mobil's reserves as being below 400 million mcf. Rather, Mobil's and Texas Eastern's actions seem contractually compelled and in good faith. Moreover, contrary to the Commission's assertion, amending the certificates does benefit the consuming public because more gas will be available for distribution by Texas Eastern. Additionally, just as encouraging settlements is in the public interest, so is abiding by settlements which are entered into in good faith and without overreaching.

Lastly, we cannot accept as a ground for overturning the settlement the Commission's rationale in its first order which denies in part Mobil's application. The Commission concluded in that order that it "has consistently refused to allow a producer to switch pricing procedures in midstream merely to allow the producer the benefit of a higher price." *Mobil Oil Corp.,* Nos. CI72–530 & –578 (Sept. 19, 1975), at A 168, *citing Texas Gas Exploration Corp.,* 52 FPC 767 (1974); *Belco Petroleum Corp.,* Nos. CI74–489 & –490 (May 16, 1975); *Gulf Oil Corp.,* 51 FPC 1340 (1974). That principle, however, is inapposite in this case.

Mobil is not seeking a certification amendment merely to obtain a higher price; its actions are required by contract. Nor, as we have noted, is the only consequence of the amendment a higher price; greater volumes of gas will flow to the public under the amendment. Indeed, as the cases cited by the Commission make clear, this is not the type of switch it has proscribed in the past. In *Belco Petroleum, supra,* the producer sought to amend paragraph (G) of its certificate, which had set the sales price at 45¢ per mcf. The producer originally had sought this price instead of the then national rate of 35¢, but after the national rate was raised to 51¢ it petitioned to amend its certificate merely to obtain the higher price. Based on the policy just noted, the Commission denied the petition. In *Texas Gas Exploration, supra,* a producer had sold gas pursuant to the optional procedure, which permitted him to charge a price above the national rate. After the national rate was raised above its selling price, however, the producer sought to withdraw its application under the optional procedure and file for the higher national rate. The Commission refused to allow the producer to withdraw its application, and we affirmed. *Texas Gas Exploration Corp. v. F.*

*P. C.,* 183 U.S.App.D.C. ——, 561 F.2d 1022 (July 28, 1977). The Commission's opinion in *Gulf Oil Corporation, supra,* is more relevant for, like this case, it involved a contract. In that case the producer, who had negotiated a favorable warranty contract, petitioned the Commission to reform its contract once the contract was no longer advantageous. The Commission denied this petition. Thus, in the three cases relied upon by the Commission, the producers attempted to avoid obligations previously imposed upon them. Mobil's actions however, as we have pointed out, are consistent with its obligations; and its application, unlike those of the producers in the three cited cases, is premised not on the bare assertion to a right to whatever is the highest price but on its legitimate expectations under its certificates and the 1972 agreements.

■ Therefore, we reject the Commission's "no switching" rule as a basis for overturning the settlement's clear mandate that the amendments be approved. As the foregoing makes clear, crucial distinctions must be drawn between this case and those on which the Commission relies. Those distinctions make the Commission's precedents inapplicable, and undermine its orders; for as we have said:

> [T]he Commission's bare application of [a principle of another case] to the . . . proceeding [in this case] without recognition of the substantial differences between the two cases . . . simply is not reasoned decision-making.

*Michigan Wisconsin Pipe Line Co. v. F. P. C.,* 171 U.S.App.D.C. 352, 357, 520 F.2d 84, 89 (1975).

## CONCLUSION

We must therefore reverse both Commission orders. The Commission's construction of the settlement, the basis for its denying rehearing, is unreasonable; and the Commission's rule forbidding the switching of pricing mechanisms is inappropriate in this case. Because the Commission has previously found the settlement and contracts to be in the public interest, and nothing has occurred since to disturb this finding, and because the Commission was bound to the settlement, we direct the Commission to recognize the amendments filed by Mobil and to accord them effectiveness as of January 1, 1975.

*So Ordered.*