**MID LOUISIANA GAS COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

Nos. 82–4470, 83–4413.

United States Court of Appeals, Fifth Circuit.

Jan. 21, 1986.

Jerome M. Feit, Sol., F.E.R.C., Norma J. Rosner, Leslie J. Lawner, argued, Washington, D.C., for F.E.R.C.

Marvin T. Griff, Alan C. Wolf, New Orleans, La., and George W. McHenry, Jr., argued, McHenry & Staffier, Washington, D.C., for Mid Louisiana Gas Co.

Wm. Warfield Ross, George A. Avery and Vaughan Finn, Washington, D.C., for Gulf States Utilities Co.

J. Michel Marcoux, Washington, D.C., for Mississippi Valley Gas Co.

Before GARZA, HIGGINBOTHAM and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Mid Louisiana Gas Company petitions for review of several orders issued by the Federal Energy Regulatory Commission (FERC) prohibiting it from pricing part of its company-owned production in accordance with the rate structure set forth in the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. §§ 3301–3432. Persuaded that Mid Louisiana is not barred from recovering NGPA prices, we reverse.

I

A

Mid Louisiana Gas Company is an interstate natural gas pipeline. Approximately forty percent of the natural gas it sells to its customers is produced by Mid Louisiana from its own properties. Prior to the enactment of the NGPA in 1978, FERC was charged, under the Natural Gas Act (NGA), 15 U.S.C. §§ 717–717w, with ensuring that producers set "just and reasonable" rates for interstate sales of natural gas. *Id.* § 717c(a). *See Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

Pursuant to this authority, FERC established a two-tiered system of pricing a pipeline's own production. "Old" pipeline production, i.e., most gas produced from wells drilled on or before January 1, 1973 or from leases acquired on or before October 7, 1969, was priced on a cost-of-service basis. *See* Order No. 98, Pricing of Pipeline Production Under the Natural Gas Act, 45 Fed.Reg. 53,901 (1980). A pipeline's cost-of-service, which incorporated its exploration and production costs, was determined in general rate cases under section 4 of the NGA, 15 U.S.C. § 717c, and if deemed "just and reasonable" by the Commission, was included in the pipeline's rate base. This rate base, multiplied by an appropriate rate of return, defined the rates a pipeline could charge its jurisdictional customers. Once established, these rates could ordinarily be increased only by filing for another general rate change under section 4 of the NGA.

In contrast, "new" pipeline production, i.e., gas produced from post-January 1, 1973 wells or post-October 7, 1969 leases, was "parity" priced at the same area or nationwide rates applicable to non-pipeline (independent) interstate producers. Unlike cost-of-service rates, these area rates could be changed semi-annually to reflect fluctuations in the cost of production; the mechanism for these adjustments was the purchased gas adjustment clause (PGA) of the tariff.[1]

The NGPA, enacted in 1978, dramatically altered FERC's regulatory authority over sales of gas by producers. While leaving intact the Commission's jurisdiction to police the prices a pipeline could charge its customers, the NGPA defrocked the Commission of its authority to set most of the prices paid for the production of natural gas. The NGPA defines several categories of natural gas production, establishes maximum prices that can be charged for "first sales"[2] in some categories, schedules in-

---

1. PGA proceedings authorized under § 154.38 of the Commission's regulations, 18 C.F.R. § 154.38, enable pipelines to track certain costs, such as well-head purchases and certain pipeline and affiliate production rates, and to adjust their rates semi-annually to reflect these costs without undergoing a general section 4 rate proceeding.

2. Section 2(21)(A) of the NGPA, 15 U.S.C. § 3301(21)(A), defines a first sale as "any sale of any volume of natural gas—(i) to any interstate

pipeline or intrastate pipeline; (ii) to any local distribution company; (iii) to any person for use by such person;" or (iv) any sale which precedes any of these sales, or (v) which follows such sales, where defined as such to avoid circumvention of maximum lawful prices. Section 2(21)(B), 15 U.S.C. § 3301(21)(B), provides that the sales just described do not include "the sale of any volume of natural gas by any interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof, unless such sale is attributable to volumes ... produc-

creases in future first sales price limits, and removes some ceiling prices altogether.

Section 601 of the NGPA, 15 U.S.C. § 3431, coordinates that Act with the NGA. Section 601(b)(1)(A), 15 U.S.C. § 3431(b)(1)(A), deems any amount paid in any "first sale" "just and reasonable" for purposes of sections 4 and 5 of the NGA, 15 U.S.C. §§ 717c, 717d, if that amount does not exceed the applicable statutory ceiling price or the gas is deregulated. An interstate pipeline is guaranteed a pass-through of these purchased gas costs in NGA section 4 rate proceedings, unless the "amount paid was excessive due to fraud, abuse, or similar grounds." 15 U.S.C. § 3431(c).

With the NGPA in place, a question soon arose over whether NGPA prices applied to pipeline as well as to independent production. Beginning with Order No. 58 in November 1979, FERC issued a series of orders and interim regulations that effectively prohibited a pipeline from pricing its company-owned production at NGPA rates. FERC held that the intracorporate transfer of company-owned gas from a production to a distribution facility did not qualify as a "first sale" eligible for NGPA pricing; instead, such production remained subject to NGA jurisdiction, which continued cost-of-service pricing for the pipeline's "old" gas.[3]

A number of pipeline producers, Mid Louisiana at the forefront, then sought review of these Commission orders. This court, in *Mid-Louisiana Gas Co. v. F.E. R.C.*, 664 F.2d 530 (5th Cir.1981) (*"Mid-La. I"*), vacated the Commission orders, holding that any production attributable to an interstate pipeline's own properties was entitled to "first sale" pricing treatment under the NGPA. *Id.* at 538. On certiorari, the Supreme Court agreed with us, stating: "The Commission's position is contrary to the history, structure, and basic philosophy of the NGPA. Like the Court of Appeals, we conclude that [FERC's] exclusion of pipeline production is 'inconsistent with the statutory mandate [and would] frustrate the policy that Congress sought to implement.'" *Public Serv. Comm'n of New York v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 3037, 77 L.Ed.2d 668 (1983) (*"Mid-La. II"*) (citations omitted.)[4]

**B**

While these issues oozed through administrative and judicial channels, many pipelines entered into Commission-approved settlements of their general section 4 rate proceedings. The interpretation of one such settlement is at issue here.

On June 13, 1980, while Mid Louisiana's application for rehearing of Order No. 58 was pending before the Commission, the company filed revised tariff sheets in Docket No. RP80–113 to implement a general increase in its jurisdictional rates of $124,-075 per year. These tariff sheets priced Mid Louisiana's "old" gas on a cost-of-service basis. On July 9, 1980, FERC accepted the proposed tariffs for filing, suspended their effectiveness for five months, and set the matter for hearing.[5] Before the hearing date, however, Mid Louisiana, FERC, and Gulf States Utilities Company,

---

ed by such ... pipeline, or local distribution company, or any affiliate thereof."

**3.** *See* Order No. 58, 44 Fed.Reg. 66,577 (1979); Order No. 98, 45 Fed.Reg. 53,091 (1980); Order No. 102, 45 Fed.Reg. 67,083 (1980). For a discussion of Order No. 58 and its progeny, *see Mid-Louisiana Gas Co. v. F.E.R.C.*, 664 F.2d 530, 533–34 (5th Cir.1981), *aff'd in part and vacated in part sub. nom. Public Serv. Comm'n of New York v. Mid-Louisiana Gas Co.*, 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983).

**4.** The Supreme Court vacated *Mid-La. I*, however, and remanded to allow the Commission, rather than the court, to determine where such "first sale" occurs. *Mid-La. II*, 103 S.Ct. at 3037.

In August 1984, FERC adopted our position, in *Mid-La. I*, 664 F.2d at 538, that the intracorporate transfer is the point of "first sale." Order No. 391, (pending rehearing), Production Under Section 2(21) of the Natural Gas Policy Act of 1978, 49 Fed.Reg. 33,849 (1984).

**5.** Under Section 4 of the NGA, the Commission is empowered to "enter upon a hearing concerning the lawfulness" of the proposed rate increase. At such hearing, the pipeline bears the "burden of proof to show that the increased rate or change is just and reasonable." 15 U.S.C. § 717c(e).

a major customer of Mid Louisiana and an intervenor here, negotiated a settlement of this rate proceeding. As in Mid Louisiana's proposed tariff sheets, this Stipulation and Agreement, approved by the Commission on April 3, 1981, priced Mid Louisiana's "old" pipeline production on a cost-of-service basis.

On December 22, 1981, Mid Louisiana requested that the Commission reopen the proceedings in Docket No. RP80–113 for the limited purpose of revising an inaccurate sales volume figure used in calculating the settlement rates. After an informal settlement conference, Mid Louisiana, the Commission, and intervenors Gulf States Utilities Company and Mississippi Valley Utilities Company, all agreed on Mid Louisiana's proposed amendment. Pursuant to this agreement, Mid Louisiana filed a motion with the Commission seeking revision of the original settlement's sales volume provisions. In its transmittal letter accompanying the motion, Mid Louisiana expressed its intent not to seek certain rate changes prior to January 1, 1983. In that same letter, however, the company stated that it intended "to file and make effective prior to January 1, 1983: rate changes pursuant to the PGA provisions of its FERC Gas Tariff ... and rate changes exclusively to recover NGPA prices for company owned production." On April 29, 1982, FERC granted Mid Louisiana's unopposed motion to amend the settlement.

This court issued its mandate in *Mid-La. I* on March 2, 1982. One week later, Mid Louisiana filed revised tariff sheets with FERC, Docket No. RP82–51–000, seeking to amend its tariff PGA clause to permit the pipeline to recover NGPA rates for all its production [6] and to reduce its base tariff rates to reflect the costs of service attributable to pipeline production. In its transmittal letter, Mid Louisiana requested that FERC waive its thirty day notice requirement, in order to make the proposed tariff sheets effective as of the *Mid-La. I* man-

date. Gulf States and Mississippi Valley intervened, opposing the proposed waiver. On April 8, 1982, FERC issued an order suspending the effective date of Mid Louisiana's proposed tariff sheets in Docket No. RP82–51–000 for five months and setting the matter for hearing. FERC explained that the revised tariffs "may be unjust, unreasonable, unduly discriminatory or otherwise unlawful" and that the Commission needed "additional time to assess the impact of *Mid-La* [*I*] on Mid La's rates." On May 10, 1982, Mid Louisiana applied for rehearing of the Commission's suspension order, arguing that suspension was incompatible with this court's mandate in *Mid-La. I.*

While this application for rehearing was still pending, Mid Louisiana, on July 1, 1982, made two additional rate filings with the Commission. In Docket No. RP82–118–000, it filed new tariff sheets requesting an increase in its jurisdictional rates, to become effective August 1, 1982. At the same time, the company filed its semi-annual PGA adjustment, Docket No. TA82–2–15–000, submitting two alternative tariff sheets. One of the tariffs, with a proposed effective date of August 1, 1982, continued cost-of-service treatment for Mid Louisiana's company-owned production. The other alternative, with a proposed effective date of August 2, 1982, reflected NGPA pricing for this production in accordance with *Mid-La. I.* On July 30, 1982, FERC issued an order in the general rate case, Docket No. RP82–118–000, accepting Mid Louisiana's tariff for filing, but suspending its effective date until January 1, 1983. FERC simultaneously issued an order in the PGA proceeding, Docket No. TA82–2–15–000, that permitted the lower cost-of-service tariff to become effective on August 1, 1982 and the higher NGPA alternative to take effect on August 2. In accepting the NGPA alternative, FERC stated that there were issues outstanding regarding NGPA pricing of pipeline production and directed that they be consolidated for

---

**6.** Apparently, Mid Louisiana was unable to recoup NGPA prices without such a tariff change because its PGA clause, at the time of settlement, defined "purchased gas costs" as the cost of gas purchased from others.

resolution with those in Docket No. RP82–51–000. On August 2, 1982, Mid Louisiana began collecting applicable NGPA rates for all company-owned production.

On November 12, 1982, FERC issued an order in Docket No. RP82–51–000, denying Mid Louisiana rehearing of the Commission's April 8, 1982 suspension order. The Commission also rejected the proposed tariff sheets filed in that docket and directed the pipeline both to return to cost-of-service pricing for its company-owned production and to refund its customers the NGPA excess Mid Louisiana had collected beginning August 2, 1982. The Commission based its denial of NGPA prices on the 1981 settlement agreement in Docket No. RP80–113. Mid Louisiana had bargained away its right to reprice its pipeline production, FERC reasoned, by failing to specifically preserve that right in the settlement agreement itself. Mid Louisiana was thus precluded from recouping NGPA prices for its pipeline production for the term of the settlement, which FERC concluded expired on January 1, 1983—the effective date of the general rate increase in Docket No. RP82–118–000. Mid Louisiana immediately petitioned this court for review of the Commission orders prohibiting it from repricing its "old" pipeline production at NGPA rates for the settlement's duration.[7]

## II

The dispositive issue in this case is whether the 1981 Commission-approved settlement between Mid Louisiana and its customers should be read to preclude Mid Louisiana from repricing its "old" pipeline production according to the rates allowable under the NGPA. FERC does not deny that Mid Louisiana has the statutory right to price all of its company-owned production at NGPA rates, a right confirmed in *Mid-La. I* and *Mid-La. II.* Instead, FERC

maintains that under the *Mobile-Sierra* doctrine, Mid Louisiana relinquished that right in the settlement of its 1981 section 4 general rate case and was therefore contractually barred, for the settlement term, from seeking rate increases to recover those prices. *See United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956); *F.P.C. v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956).[8]

### A

Commission-approved voluntary settlements like that in Docket No. RP80–113 allow both the Commission and the regulated entity "to avoid the delays and uncertainties of litigation." *Texas Gas Transmission Corp. v. F.P.C.,* 441 F.2d 1392, 1394 (6th Cir.1971). As such, they should be encouraged, rather than discouraged. *Texas Eastern Transmission Corp. v. F.P.C.,* 306 F.2d 345, 347 (5th Cir.1962), *cert. denied,* 375 U.S. 941, 84 S.Ct. 347, 11 L.Ed.2d 273 (1963).

> [O]ne sure way to discourage voluntary settlements is for the Commission, at the behest of one party or the other, or the ubiquitous intervenors, to read into contracts things which are simply not expressed or not there, out of the thoroughly commendable (and understandable) feeling that unless that is done the result is not as good as it ought to have been.... Consequently, both in its substantive provisions and in the terminology sought to memorialize the undertaking, the parties ought to be able to accept the contract as drafted, executed and approved. It should stand for what it says.

*Id.,* 306 F.2d at 348.

In determining what a settlement says or does not say, general principles of contract

---

7. Mid Louisiana initially petitioned for review of FERC's orders of April 8 and November 12, 1982. Fearing that these orders might not yet be final, the pipeline later applied to FERC for rehearing of the November order. After the Commission denied this application for rehearing, Mid Louisiana again sought judicial review. The pipeline's two petitions for review have been consolidated here on appeal.

8. The *Mobile-Sierra* doctrine prohibits a pipeline from filing for unilateral rate increases inconsistent with private contractual arrangements with its customers. *See Pennzoil Co. v. F.E.R.C.,* 645 F.2d 360, 373–74 (5th Cir.1981), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982).

interpretation apply. *See Mitchell Energy Corp. v. F.P.C.*, 519 F.2d 36, 40 (5th Cir. 1975); *Texas Eastern*, 306 F.2d at 347. The Commission argues that its status as an administrative agency requires us to accord substantial deference to its interpretation of the settlement. Contract construction, however, is a question of law. Although there may be room to defer to the views of the agency "where the understanding of the problem is enhanced by the agency's expert understanding of the industry," agency interpretation on such questions is not conclusive. *Coca-Cola Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 608 F.2d 213, 222 (5th Cir.1979); *see also Cincinnati Gas & Elec. Co. v. F.E.R.C.*, 724 F.2d 550, 554 (6th Cir.1984); *Columbia Gas Transmission Corp. v. F.P.C.*, 530 F.2d 1056, 1059 (D.C.Cir.1976). *But cf. Consolidated Gas Supply Corp. v. F.E.R.C.*, 745 F.2d 281, 291 (4th Cir.1984), (interpretation by federal agency entitled to deference) (dictum), *cert. denied*, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985). Here, the Commission relies solely on the language of the settlement agreement itself, rather than on any technical or factual expertise. We thus "need not defer to the Commission's interpretation, but can review it freely." *Cincinnati Gas & Elec.*, 724 F.2d at 554.

In construing a settlement agreement, a court must place itself in the position of the parties at the time of execution and attempt to divine their intent. It must read the contract in light of the then existing regulatory framework, *Texas Eastern Transmission*, 306 F.2d at 347, as well as "the instrument itself, its purposes, and the circumstances of its execution and performance." *Pennzoil Co. v. F.E.R.C.*, 645 F.2d 360, 388 (5th Cir.1981), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). *See also Mobil Oil Corp. v. F.P.C.*, 570 F.2d 1021, 1025 (D.C.Cir.1978); *Mitch-*

*ell Energy*, 519 F.2d at 41; *Texas Gas Transmission*, 441 F.2d at 1395. With these hornbook principles in mind, we turn to the settlement at issue here.

### B

We start with the language of the contract itself. It is undisputed that Mid Louisiana, in settlement of the section 4 rate case, agreed on a dollar amount it would charge its customers. It is also clear that Mid Louisiana agreed in some detail as to how that rate was to be computed. The agreement plainly shows that Mid Louisiana's company-owned production was priced on a cost-of-service basis. FERC maintains that by using this pricing method, Mid Louisiana unambiguously agreed to price its old pipeline production on a cost-of-service basis. Because Mid Louisiana failed to specifically and expressly reserve its right to reprice that production should it prevail in the pending *Mid-La.* controversy, FERC concludes that the pipeline "must by law be deemed to have given up that right."

Mid Louisiana suggests that FERC's interpretation of the settlement indirectly disregards, or at least postpones, the effect of this court's mandate in *Mid-La. I.* The company argues that it expressly preserved its statutory right to reprice its old gas in the settlement itself. Article I of the 1981 settlement provides that "Mid Louisiana's pipeline production is priced at Natural Gas Policy Act (NGPA) rates or priced on a cost-of-service basis." Mid Louisiana urges that this language gave it the right to price its pipeline production according to whichever method was ultimately held proper.[9] Article IX, which recognized Mid Louisiana's right to make "PGA filings and filings pursuant to this Stipulation and Agreement,"[10] the pipeline

---

9. The Commission claims the language in Article I was merely a "bland recitation" of the existing pricing scheme for all of Mid Louisiana's pipeline production, both old and new.

10. Article IX provides:

This Stipulation and Agreement, upon approval by the Commission, shall be effective as of the date of such approval and shall terminate on the date that a rate change filing by Mid Louisiana under Section 4 of the Natural Gas Act, other than PGA filings and filings pursuant to this Stipulation and Agreement, is

continues, gave it the right to make appropriate rate or tariff changes under section 4 of the NGA to recover NGPA prices allowed by Article I and *Mid-La. I.* Finally, Mid Louisiana directs us to the "General Reservations" clause in Article XI of the agreement. This clause provides that "except as expressly stated herein, no party shall be deemed to have approved, accepted, agreed, or consented to any rate-making or tariff principle or any method of cost of service determination ... underlying or supposed to underlie any of the rates, refunds, or future adjustments to rates provided herein." The pipeline company argues that this language clearly preserved its rights with respect to issues unaddressed in the settlement. FERC, of course, maintains that this provision is inapplicable because Article I "expressly stated" that the pre-existing pricing scheme for pipeline production would continue to be applied.

## C

■ We are unpersuaded that these provisions of the settlement agreement were specific enough to constitute express references to Mid Louisiana's right to reprice its pipeline production in the event that it prevailed in the *Mid-La.* litigation. Nevertheless, we cannot agree with the Commission that by utilizing cost-of-service pricing in settling its section 4 rate case, Mid Louisiana also gave up its right to reprice its "old" gas. The purpose of the settlement agreement, as well as the administrative background and circumstances attending its execution, lead us to conclude that Mid Louisiana's statutory right to reprice its company-owned production at NGPA rates was simply not at issue in the settled section 4 rate case. Absent an integrated document purporting to govern all relationships between the parties, such silence will not be taken to indicate relinquishment of a valuable right. *Mobil Oil*, 570 F.2d at

1025; *Texas Gas Transmission*, 441 F.2d at 1396.

Though the settlement in Docket No. RP80–113 was negotiated in a period of legal uncertainty regarding a pipeline's rights under the NGPA, Mid Louisiana was nevertheless bound by effective Commission regulations when it filed its proposed tariff sheets in that rate proceeding. *See Ecee, Inc. v. F.P.C.*, 526 F.2d 1270, 1274 (5th Cir.), *cert. denied*, 429 U.S. 867, 97 S.Ct. 176, 50 L.Ed.2d 147 (1976); *Jupiter Corp. v. F.P.C.*, 424 F.2d 783, 791 (D.C.Cir. 1969), *cert. denied*, 397 U.S. 937, 90 S.Ct. 944, 25 L.Ed.2d 118 (1970). One such regulation, Order No. 58, required that "old" company-owned production be priced on a cost-of-service basis. Had Mid Louisiana and its customers not reached a settlement, the pipeline's rates would have been set by the Commission after a hearing, utilizing cost-of-service pricing for company-owned "old" gas. The rates ultimately settled upon were not transfigured by the happenstance that they were arrived at through an agreement, rather than through government action. In basing its rates on its cost-of-service, Mid Louisiana was simply adhering to Commission regulations that were binding at that time.

FERC's position rests on a view of the settlement agreement as a completely integrated document attempting to govern all relationships and resolve all issues between the parties. FERC would thrust the burden on the regulated entity, in settling a section 4 rate case, to make provision for everything, including safeguards against every unknown, but conceivable, contingency. That, however, is not the nature of a settlement. *See Texas Eastern Transmission*, 306 F.2d at 357. Settlements "pertain only to those issues which they specifically resolve, ... they cannot be construed as having general application even to arguably analogous issues which the agreement does not purport to cover." *Texas Gas Transmission*, 441 F.2d at 1396.

made effective, or on the effective date of any change in rates resulting from a rate proceeding instituted after the date hereof by the Commission with respect to Mid Louisiana's

jurisdictional rates, whichever shall occur first, except as otherwise provided for in Articles IV, V, VI and VII.

Here, the introduction to the Stipulation and Agreement described the settlement as "resolving all issues *in this docket*" (emphasis added). It is plain that only certain discrete issues relating to computation of Mid Louisiana's jurisdictional rates were actually at issue and resolved in the 1981 agreement. The bulk of the settlement was devoted to determining the proper dollar figures for cost of service items, rate of return, and depreciation. The "General Reservations" clause in Article XI further reflects the non-global nature of the settlement, which reached only those issues "expressly stated [t]herein."

It is equally plain that the settling parties did not intend that all their disputes be resolved in Docket No. RP80–113. Although the pipeline production pricing issue was not subject to negotiation, it certainly was subject to review. The validity of Order No. 58 was being hotly contested by Mid Louisiana and other pipelines at the time this settlement was consummated. The Commission and Mid Louisiana's customers were well aware of this pending litigation and of the pipeline's stance in it.

The implausibility of the Commission's interpretation is also illustrated by the economics of the case. Mid Louisiana estimates that the difference between NGPA pricing and cost-of-service pricing of its pipeline production for the settlement period approaches $9 million. Even when one allows for the uncertainty of economic predictions, it boggles the imagination to suppose that Mid Louisiana tacitly agreed to relinquish its right to a claim of this order of magnitude in return for a $124,000 increase in jurisdictional rates. Common sense tells us that not even the uncertainty of prevailing in *Mid-La. I* could explain such an enormous and unexpressed surrender.

Our conclusion that the settlement was silent on and inapplicable to the issue in the *Mid-La.* litigation is further reinforced by the conduct of the settling parties themselves. In its transmittal letter accompanying its motion to amend the 1981 settlement, Mid Louisiana stated its intent to "file ... rate changes exclusively to recover NGPA prices for company-owned production." This motion was unopposed; neither FERC nor the pipeline's customers objected to the statement of intent as contrary to the original settlement. After *Mid-La. I*, Mid Louisiana sought to amend its PGA tariff to recover NGPA rates for all its production. FERC suspended the proposed tariff's effective date on the ground that it "may be unjust, unreasonable, unduly discriminatory, or otherwise unlawful." Again, no specific objection was made that the proposed tariff would violate the 1981 settlement. Nor did Mid Louisiana's jurisdictional customers object on the basis of the settlement. Their complaint, rather, was aimed at Mid Louisiana's proposed waiver of the tariff notice requirements. FERC subsequently accepted the pipeline's alternative PGA filing, which reflected NGPA prices for "old" gas, noting only that there were issues outstanding regarding NGPA pricing to be resolved in a consolidated proceeding. Gulf States, a party to the 1981 settlement, merely requested that implementation of *Mid-La. I* be deferred pending Supreme Court review. In short, it was not until November 1982, after Mid Louisiana had begun collecting NGPA rates, that the 1981 settlement was thought to preclude Mid Louisiana from repricing its pipeline production under the NGPA. If, as FERC now contends, Mid Louisiana had intentionally bargained away this right in settlement of the 1981 rate case, that agreement surely would have been raised earlier in objection to the pipeline's obvious attempt to take advantage of our decision in *Mid-La. I. Cf. Mobil Oil*, 570 F.2d at 1025 (lack of objection a circumstance reflecting parties' intent).

The Commission and Mid Louisiana were apparently "acting as private parties often do in making stipulations or negotiating contracts: as narrowing areas of disagreement and settling immediate issues between themselves without litigation, leaving other issues to be resolved in another forum." *Texas Gas Transmission*, 441 F.2d at 1395. That Mid Louisiana did not

expressly and specifically reserve the then-merely-potential right to take advantage of *Mid-La. I* does not imply that it had agreed to relinquish that right. *See Texas Gas Transmission,* 441 F.2d at 1395. The 1981 settlement simply did not speak to the NGPA issue then pending before this court in *Mid-La. I.* We refuse to "deem" that Mid Louisiana's silence regarding its right to recover NGPA prices should it ultimately prevail in the *Mid-La.* litigation constituted a waiver of that very valuable right. To do so would read into the contract something that simply is not there. *See Texas Eastern Transmission,* 306 F.2d at 348.

### D

The Commission relies heavily on the recent decision in *Consolidated Gas Supply Corp. v. F.E.R.C.,* 745 F.2d 281 (4th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2702, 86 S.Ct. 2702 (1985). There, the Fourth Circuit reviewed two rate settlement agreements between a pipeline company and FERC, both of which were negotiated at a time when the *Mid-La.* issue was "very much in dispute." 745 F.2d at 287. In the first settlement, the pipeline specifically reserved the right to contest the applicability of NGPA rates to its "old" production. In the second agreement, however, it failed to make a similar reservation. After *Mid-La. I,* FERC allowed the pipeline to collect NGPA prices for the period covered by the first settlement. It disallowed recovery for the term of the second agreement, reasoning that the pipeline had failed to preserve its statutory rights. The Fourth Circuit affirmed.

We find *Consolidated* distinguishable from the present case. That Consolidated expressly preserved the pricing issue in its first settlement, but not in the second, undoubtedly influenced the Fourth Circuit's holding. The court stated that "the reservation in one and the lack of reservation in the other spring forth and compel the conclusion that the hope of NGPA pricing for the ... period [of the second settlement] had been discarded by [Consolidated], presumably in return for another benefit or

other benefits." 745 F.2d at 291. Here, by contrast, there was no such midstream deletion of language to indicate that the pipeline had "discarded" the right it so vigorously claimed from the inception of the NGPA.

The Fourth Circuit, however, indicated that the language of the second settlement "standing alone was probably enough to support [its] result." *Id.* In contrast to Mid Louisiana's settlement, though, the agreement in *Consolidated* was held to be an "integrated contract," which purported to resolve "all of the cost of service issues and the PGA issues" "except for certain reserved issues *as specified in* [*the*] *agreement.*" 745 F.2d at 288 & n. 16 (emphasis in 4th Circuit opinion). In contrast, the stated purpose of Mid Louisiana's settlement was to resolve "all issues in *this docket.*" No mention was made of cost-of-service as an "issue." Moreover, the "General Reservations" clause claimed to reserve, not "resolve," all issues "except those stated herein." We deal here with a non-global instrument that cannot be "deemed" to have waived an unmentioned, and at that time unexercisable, right.

### E

In sum, then, the 1981 settlement agreement did not contemplate the relinquishment of the *Mid-La.* right to price pipeline production at NGPA rates. The settlement in Docket No. RP80–113 did not preclude Mid Louisiana from making appropriate filings to recover applicable NGPA rates in the event that its *Mid-La.* challenge succeeded. The Commission thus erred in preventing Mid Louisiana from recovering NGPA rates for its "old" pipeline production for the period between August 2, 1982 and January 1, 1983, the period encompassed in the orders under review.

### III

Mid Louisiana asserts that its tariff sheets in Docket No. RM82–51–000 were filed, on March 9, 1982, for the sole purpose of implementing this court's March 2 mandate in *Mid-La. I.* The pipeline compa-

ny argues that the Commission abused its discretion under section 4 of the NGA in suspending the effective date of those tariff sheets for the statutory maximum of five months (until August 2, 1982). *See* 15 U.S.C. § 717c(e).

Our power to review FERC rate suspensions is very narrow. Generally, a court "may not review a Commission decision as to whether or not to suspend a rate, at least as long as the agency complies with its statutory obligation to give a reason, and in no other way oversteps the bounds of its authority." *Exxon Pipeline Co. v. United States*, 725 F.2d 1467, 1470 (D.C. Cir.1984) (footnote and citations omitted). Although FERC must articulate reasons for a suspension and its length that will " 'enable a court to determine whether the [Commission's] decision was reached for an impermissible reason or for no reason at all,' " we cannot "take the next step and review the merits of a given case." *Id.* at 1473 (quoting *Dunlop v. Bachowski*, 421 U.S. 560, 573, 95 S.Ct. 1851, 1860–61, 44 L.Ed.2d 377 (1975)).

■ We cannot say that FERC's articulated reasons for suspending Mid Louisiana's tariff failed this test. The pipeline's filing proposed a method for implementing *Mid-La. I*,[11] but FERC stated that it needed time to review that proposal and determine how best to go about allowing the pipeline industry to recover NGPA rates.[12] We do not find that reason "impermissible," and thus do not overturn the Commission's suspension.

We do note, however, that the Commission has never denied that Mid Louisiana, after *Mid-La. I* and *Mid-La. II*, has the statutory right to collect NGPA rates for its "old" pipeline production. The Commission is authorized to "undo what is wrongfully done by virtue of its order" when that order has been overturned by a reviewing court. *United Gas Improvement Co. v. Callery Properties, Inc.*, 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965); *Iowa Power and Light Co. v. United States*, 712 F.2d 1292, 1297 (8th Cir.1983), *cert. denied*, 466 U.S. 949, 104 S.Ct. 2150, 20 L.Ed.2d 536 (1984). *Cf. Tennessee Valley Municipal Gas Ass'n v. F.P.C.*, 470 F.2d 446, 452 (D.C.Cir.1972) (petitioner "must be put in the same position that it would have occupied had the [Commission] error not been made"). We note further that our holding today speaks only to the orders *sub judice*. We do not decide whether Mid Louisiana has the right to retroactive recovery of NGPA rates for the period from December 1, 1978, the effective date of the NGPA, to August 2, 1982, the effective date of the instant Commission orders.[13]

## IV

In view of our holding that the 1981 settlement agreement did not bar Mid Louisiana from repricing its pipeline production, we need not reach the pipeline's remaining contention that the Commission erred in determining the termination date of that settlement.

**11.** Mid Louisiana's March tariff sought to implement *Mid-La. I* by amending the definition of "purchased gas costs" to include pipeline production and by reducing its base rates to eliminate costs of service attributable to that production.

**12.** In suspending Mid Louisiana's March rate filings, FERC acknowledged that it was bound by the unstayed mandate in *Mid-La. I*. It contended, however, that it had "the discretion to determine the appropriate procedures to implement the *Mid-La.* decision, and ... determine when these rates can be collected." A five month suspension, it explained, was necessary for "adequate review" of the complex factual

and legal issues specific to Mid Louisiana, as well as *Mid-La. I*'s "broad industry-wide ramifications." *See* FERC Order Denying Rehearing, Vacating Hearing and Requiring Refund (Nov. 12, 1982).

**13.** Mid Louisiana indicates that it may file to recover NGPA rates for the period between the effective date of the NGPA and our *Mid-La. I* mandate. Although this issue is not before us, we note that in *Kentucky West Virginia Gas Company v. F.E.R.C.*, 780 F.2d 1231 (5th Cir. 1986), a case decided this day, FERC permitted a pipeline to recover NGPA rates for its company-owned production from the effective date of the NGPA.

V

Because the orders under review are contrary to the NGPA and to this court's mandate in *Mid-La. I,* and because the orders cannot be sustained under the *Mobile-Sierra* doctrine, we REVERSE and REMAND to the Commission to permit Mid Louisiana to recover NGPA rates from August 2, 1982 forward, without prejudice to Mid Louisiana's right to seek retroactive recovery of the applicable NGPA rates as of that Act's effective date.

REVERSED AND REMANDED.