NATIONAL FUEL GAS SUPPLY
CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Public Service Commission of the State
of New York, Pennsylvania Public
Utility Commission, Intervenors.

NATIONAL FUEL GAS SUPPLY
CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Pennsylvania Public Utility
Commission, Intervenor.

Nos. 84–1246, 84–1285.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 26, 1986.
Decided Feb. 20, 1987.

George L. Weber, with whom John T. Ketcham and Joseph O. Fryxell, Washington, D.C., were on brief, for petitioner.

John N. Estes, III, Atty., Federal Energy Regulatory Commission, Washington, D.C., for respondent. William H. Satterfield, Gen. Counsel, Jerome M. Feit, Sol., and Thomas E. Hirsch, III, Atty., Federal Energy Regulatory Commission, Washington, D.C., were on brief for respondent. Barbara J. Weller and Leslie J. Lawner, Attys., Federal Energy Regulatory Commission, Washington, D.C., also entered appearances, for respondent.

David D'Alessandro, Washington, D.C., with whom David E. Blabey, Albany, N.Y., and Richard A. Solomon, Washington, D.C., were on brief, for intervenor Public Service Commission of the State of New York.

James P. Melin, John F. Povilaitis and Charles F. Hoffman, Harrisburg, Pa., were on brief, for intervenor Pennsylvania Public Utility Commission.

Before EDWARDS, BORK and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

The National Fuel Gas Supply Corporation ("NFGS") appeals from three orders of the Federal Energy Regulatory Commission that denied its request for a retroactive rate increase. NFGS seeks an increase in the rates it charged for selling certain natural gas in interstate commerce between December 1, 1978, and May 31, 1982. We affirm the decision of the Commission.

## I.

The natural gas NFGS sells in interstate commerce comes from two sources. Most of it is purchased by NFGS from independent or affiliated producers; a relatively small amount is produced by the company itself. Under the current regulatory scheme, the price that NFGS can charge for its gas is largely dependent on the costs it incurs to obtain the gas.

NFGS bases its request for a retroactive rate increase on a decision of the Fifth

Circuit Court of Appeals, subsequently affirmed by the Supreme Court, which construed some of the pricing provisions in the Natural Gas Policy Act of 1978. *See Mid-Louisiana Gas Co. v. FERC,* 664 F.2d 530 (5th Cir.1981) (*"Mid-Louisiana Gas I "*), *aff'd in part and vacated in part sub nom. Public Serv. Comm'n v. Mid-Louisiana Gas Co.,* 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983) (*"Mid-Louisiana Gas II "*). The Act established a new pricing schedule that allowed companies to recover higher costs for "first sale" gas than for other categories of gas. *See* 15 U.S.C. §§ 3301–3332 (1982). Immediately after the Act was passed, the Commission issued implementing regulations that prohibited most gas produced and sold by a single company from being priced at the higher levels that the Act established for "first sale" gas, which comprises most gas that is purchased from independent or affiliated producers and then resold in interstate commerce. *See* Proposed Regulations, 43 Fed.Reg. 53,270, 53,280, 53,332–33 (Nov. 15, 1978); Interim Regulations, 43 Fed. Reg. 56,448, 56,461–63, 56,549–50 (Dec. 1, 1978); Final Rule Governing the Maximum Lawful Prices for Pipeline, Distributor, or Affiliate Production, 44 Fed.Reg. 66,577 (Nov. 20, 1979), *reh'g denied,* 45 Fed.Reg. 67,083 (Oct. 9, 1980) (codified as amended at 18 C.F.R. § 270.203 (1983)). The two court decisions, however, rejected the Commission's definition of "first sale" gas. The Supreme Court held that the Act's higher ceiling prices applied to gas produced and sold by a single company.[1]

NFGS seeks an increase in rates it had charged in compliance with the Commission's now-invalidated interpretation of the statute. After the Fifth Circuit had reversed the Commission, NFGS filed for a purchased gas adjustment with the Commission. NFGS sought prospective recovery of the Act's higher "first sale" prices on all gas that the company itself produced and sold after June 1, 1982. The company also claimed the right, which it subsequently tried to exercise, to collect through a retrospective surcharge the same higher prices on all gas that the company itself had produced and sold between December 1, 1978, and June 1, 1982.

In considering NFGS's request for a retroactive rate adjustment, the Commission divided the pertinent span of time into two parts. For the period from December 1,

---

**1.** The new schedule of higher prices under the Act apply only to "first sale" gas. The term "first sale" is defined as follows:

(A) General rule

The term "first sale" means any sale of any volume of natural gas—

(i) to any interstate pipeline or intrastate pipeline;

(ii) to any local distribution company;

(iii) to any person for use by such person;

(iv) which precedes any sale described in clauses (i), (ii), or (iii); and

(v) which precedes or follows any sale described in clauses (i), (ii), (iii), or (iv) and is defined by the Commission as a first sale in order to prevent circumvention of any maximum lawful price established under this chapter.

(B) Certain sales not included

Clauses (i), (ii), (iii), or (iv) of subparagraph (A) shall not include the sale of any volume of natural gas by any interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof, unless such sale is attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof.

15 U.S.C. § 3301(21) (1982).

The term "first sale" gas is somewhat confusing because it refers not to gas that is initially sold, but to gas that is resold after previously having been the subject of a "first sale" as defined in the Act. The Commission had refused to classify most gas produced and sold by a single company as "first sale" gas because such gas was sold *initially* to the company's customers and had not been subject to any antecedent "first sale." The Fifth Circuit and the Supreme Court rejected this position, finding that Congress intended such gas to be treated as "first sale" gas, which the courts achieved by calling the intracorporate transfer of the gas between the production division of the company and the transportation division of the company the "first sale" that preceded the eventual sale of the gas to the company's customers. *See Mid-Louisiana Gas I,* 664 F.2d at 535–37, *aff'd in part and vacated in part, Mid-Louisiana Gas II,* 463 U.S. at 327–43, 103 S.Ct. at 3029–38 (Commission is obligated to treat either the intracorporate transfer or the downstream transfer to consumers as a "first sale"). That reversal of the Commission is the basis of NFGS's claim that it is now entitled to a retroactive rate increase.

1978, to October 31, 1980 ("Period I"), NFGS's rates had been set in a final order entered by the Commission. *National Fuel Gas Supply Corp.*, 8 F.E.R.C. (CCH) ¶ 61,135 (Aug. 6, 1979). The Commission denied any retroactive adjustment of these rates because they were fixed in a final adjudication in which the Commission heard and decided all of the issues raised by NFGS. In particular, NFGS did not raise or reserve the issue of how "first sale" gas should be priced under the Act during any of the proceedings that led up to this final order. *See National Fuel Gas Supply Corp.*, 27 F.E.R.C. (CCH) ¶ 61,111, at 61,210 (Apr. 20, 1984), *modifying* 26 F.E.R.C. (CCH) ¶ 61,105 (Jan. 31, 1984), *reh'g denied*, 28 F.E.R.C. (CCH) ¶ 61,012 (July 5, 1984). For the period from November 1, 1980, to June 1, 1982 ("Period II"), NFGS's rates had been established in a settlement reached with its customers and approved in an order entered by the Commission. *National Fuel Gas Supply Corp.*, 15 F.E.R.C. (CCH) ¶ 61,058 (Apr. 21, 1981). The Commission denied any retroactive adjustments in these rates because it read the settlement order as failing to preserve any right for NFGS to object to these rates later on the grounds that "first sale" gas had been priced improperly under the Act. *See National Fuel*, 27 F.E.R.C. (CCH) at 61,210–12. We consider the two periods in turn.

## II.

■ We think the Commission was correct in denying retroactive adjustment for Period I. Those rates were set by an order of the Commission after a proceeding in which all controverted matters were briefed and argued. When NFGS did not file for rehearing of this decision, it became a final order. *See* 15 U.S.C. § 717r(a) (1982). If NFGS wished to contest the Commission's position on what constituted "first sale" gas under the Act, it could have done so before the Commission and, if it did not get satisfaction there, could have brought its contentions before the courts, as did the Mid-Louisiana Gas Company that ultimately prevailed on this issue before

the Supreme Court. But NFGS did nothing either to raise this issue itself or to reserve the issue in light of the pending challenges that other parties had brought in other proceedings. The challenge to the Commission's order several years after it became final and effective comes too late. *Cf. City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 335–37, 78 S.Ct. 1209, 1218–19, 2 L.Ed.2d 1345 (1958) (Congress may prescribe the procedures and conditions under which review of administrative orders may be had, and Congress has stated that all objections to a final Commission order must be made on direct review in the appellate court or not at all).

NFGS offers three objections to this conclusion. First, it argues that it could not raise the "first sale" issue in the Period I ratemaking because the law was not changed in its favor until after that ratemaking had concluded. On this point, NFGS notes that the hearing record in the rate case for Period I closed on April 27, 1978, several months before the Act was passed on December 1, 1978. This argument ignores the fact that the Commission's order setting the rates for Period I was not entered until nine months later, on August 6, 1979. NFGS could have tried to raise this new point during those nine months, or it could have sought rehearing of the Commission's decision after the order was entered. These avenues afforded ample opportunity to raise the "first sale" issue, but NFGS failed to pursue them and by that failure became subject to the jurisdictional bar. *See Midwestern Gas Transmission Co. v. FERC*, 734 F.2d 828, 832 (D.C.Cir.1984).

■ Second, NFGS argues that it must be permitted to recover retroactively the higher ceiling prices that the Act allows for "first sale" gas, if the Supreme Court's decision in *Mid-Louisiana Gas II* is to be given its proper effect and if the Commission is to be held to its statutory duty to "carry out" the terms of the Act. 15 U.S.C. § 3411(a) (1982). But this is not so. To begin with, the Supreme Court did not

require the Commission to apply the *Mid-Louisiana Gas II* decision retroactively to modify all of the final rate orders that have been entered over the years since the Act was enacted. Without any such explicit command, the usual presumption is that a judicial decision should be given prospective effect except in the particular case in which the ruling is made. There is no imputation that the Commission has embarked on a deliberate program to sabotage the Act's provisions or to refuse to carry out its mandates; the Commission simply committed an error of interpretation. In addition, the usual presumption is even more to the point here because nothing in the Act or the Supreme Court's decision *requires* that all "first sale" gas be priced at the ceiling prices set out in the Act. Those are "ceiling" prices only, and for any number of reasons, including representations of customers, a company or the Commission may decide that some "first sale" gas should be priced at lower rates than the Act permits. In particular, in this case NFGS's filing for Period I valued its own production merely at cost-of-service rates, and not at the highest rates that were available even before the Act was passed. The Commission accepted NFGS's valuation, which became the basis for the Period I rate order. *See National Fuel Gas Supply Corp.,* 5 F.E.R.C. (CCH) ¶ 63,018, at 65,148–49 (Nov. 14, 1978).

■ Finally, NFGS argues that it was entitled to a retroactive rate adjustment because its request complies with the Commission's established procedures for allowing purchased gas adjustments. These procedures essentially allow a company to modify a final rate order if it can show that the cost of its purchased gas has changed since that order was entered. In particular, the purchased gas adjustment procedures apply where the cost of a company's gas is valued on the basis of area or nationwide rates, as was often done prior to the Act, or if the cost of the gas is valued on the basis of the ceiling prices set out in the Act. These bases for valuing the cost of a company's gas often change quite abruptly over the duration of a rate order, and the special procedures for a purchased gas adjustment permit the company's rates to be modified expeditiously when such changes occur.

In this instance, NFGS seeks a purchased gas adjustment to Period I rates for gas that was valued not on any of these bases, but on a cost-of-service basis. The Commission's practice, however, does not allow a purchased gas adjustment for gas that a company itself produced and that was valued on a cost-of-service basis; it only permits adjustments to be made to a company's rates that reflect "changes in its cost of *purchased* gas." Purchased Gas Cost Adjustment Provision in Natural Gas Pipeline Companies' FPC Gas Tariffs, 47 F.P.C. 1049, 1053 (1972) (emphasis added); *see* Final Regulation, 43 Fed.Reg. 56,031, 56,033 (Nov. 30, 1978) (codified at 18 C.F.R. § 154.38 n. 1 (1979)). If NFGS's own gas production had been valued on the basis of area or nationwide rates, as it conceivably could have been, then the procedures for a purchased gas adjustment might have been applicable. But the Commission ruled in its rate order for Period I—and NFGS accepted its ruling—that "National Fuel's own production ... should be priced on a cost of service basis rather than on the basis of applicable nationwide rates." *National Fuel,* 8 F.E.R.C. (CCH) at 61,517. The magnitude of the various service costs that went into valuing this gas were fully considered and determined in the proceedings that culminated in that order, and the purchased gas adjustment procedures simply cannot be invoked to modify those determinations at this point.

■ NFGS formulates one last argument in an attempt to avoid this conclusion. It claims that the "first sale" provisions of the Act, as subsequently clarified in the courts, implicitly reclassified the company's own gas production as "purchased" gas, thus that the Act itself requires the Commission to permit modification of the prior valuation of this gas under the purchased gas adjustment procedures. This argument is essentially a more complicated re-

prise of NFGS's earlier arguments that the judicial interpretation of the Act should be applied retroactively and that the company should not be bound by its failure to contest the Commission's order valuing this gas on a cost-of-service basis. As we have noted, a purchased gas adjustment is merely a procedural device to update a rate order when the prices that underlie its valuations have changed. Here NFGS asserts not that those prices have changed, but that the Act has changed the entire valuation scheme. Although that assertion is correct, it does not justify using this procedural mechanism to overturn final rate orders that were entered under Commission rules that were valid at the time, particularly since at the time NFGS could have sought to value this gas at higher prices, but did not. We cannot read into the Act commands that do not appear in its text and were not contemplated by Congress.

### III.

Unlike the rates for Period I, which were fully adjudicated before the Commission, the rates for Period II were set in a settlement that NFGS and its customers reached and that the Commission approved. This difference is important: while NFGS is required to contest a point it wishes to preserve in an adjudicatory proceeding, the settlement either may have reserved the issue or simply may not purport to cover the issue. The question of whether the Commission erred in denying any rate increase for Period II thus depends on the correctness of the Commission's reading of the settlement agreement. The Commission concluded that the settlement addressed the issue of whether to value NFGS's own gas production on a cost-of-service basis, and that NFGS did not reserve any right to reprice this gas if it were later found to be "first sale" gas under the Act. *See National Fuel,* 27 F.E.R.C. (CCH) at 61,210–12.

The threshold issue is whether a court should give any deference to an agency's reading of a settlement agreement. The federal appellate courts have taken differ-

ent positions. The view that a court should give no deference to an agency's reading rests on the traditional rule that a court may freely review an agency on questions of law. Where an agency's reading "relies solely on the language of the settlement agreement itself, rather than on any technical or factual expertise," the interpretation of that language is solely a question of law, and no deference is appropriate. *Mid Louisiana Gas Co. v. FERC,* 780 F.2d 1238, 1243 (5th Cir.1986) (*"Mid Louisiana Gas III"*); *see also Cincinnati Gas & Elec. Co. v. FERC,* 724 F.2d 550, 554 (6th Cir.1984). The second view holds that even on matters of pure interpretation the agency "is entitled to deference" and its conclusions will carry "great weight" because the agency is "unmistakably possessed ... of special expertise." *Consolidated Gas Supply Corp. v. FERC,* 745 F.2d 281, 291 (4th Cir.1984), *cert. denied,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985); *see also Amoco Prod. Co. v. FERC,* 765 F.2d 686, 690 (7th Cir.1985) (a court must give "some deference" to the agency's interpretation of a contract).

In this circuit, the issue has been approached in a variety of ways. In a number of cases, particularly those in which this court reviews actions taken by the Federal Energy Regulatory Commission, a rule of deference has been stated. *See, e.g., Southern Cal. Edison Co. v. FERC,* 805 F.2d 1068, 1072 (D.C.Cir.1986) (agency interpretation of a contract "is entitled to considerable deference from the generalist judiciary"); *Papago Tribal Util. Auth. v. FERC,* 723 F.2d 950, 953 (D.C.Cir.1983) (according "appropriate deference" to "the expert agency that deals with such contracts regularly"), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 820 (1984). On other occasions, however, this court has refused to defer to an agency's interpretation of a contract. *See, e.g., Lowey v. Watt,* 684 F.2d 957, 965 (D.C.Cir.1982) (no deference where agency's interpretation is "explicitly based on principles of contract interpretation"). This court has also suggested the appropriate standard of review may depend on the factual context, with

deference being more appropriate where issues of fact or policy are involved, *see, e.g., North Atlantic Westbound Freight Ass'n v. Federal Maritime Comm'n,* 397 F.2d 683, 685 (D.C.Cir.1968), or where technical knowledge is required, *see, e.g., Lowey,* 684 F.2d at 965; *Columbia Gas Transmission Corp. v. FPC,* 530 F.2d 1056, 1059 (D.C.Cir.1976).

■ We believe that the correct view requires a court to give deference to an agency's reading of a settlement agreement even where the issue simply involves the proper construction of language. There are several reasons for this conclusion. By far the most important is that the Supreme Court's decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), has rejected the view that a court may freely review an agency on pure questions of law. *Chevron* considered the proper standard for judicial review of an agency's statutory interpretation, and the construction of a statute has always been considered a "pure" question of law. Yet the Court held that unless Congress has "directly addressed the precise question at issue, the court does not simply impose its own construction on the statute," but must consider instead "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. The Court was even more emphatic in a footnote to this discussion, stating that a court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, *or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.*" *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11 (emphasis added).

The *Chevron* Court noted that Congress delegates to an agency the power to administer a congressionally created program. When Congress leaves gaps in the program, either explicitly by authorizing the agency to adopt implementing regulations, or implicitly by enacting an ambiguously worded provision that the agency must interpret, it has explicitly or implicitly delegated to the agency the power to fill those gaps. That delegation requires the courts to defer to an agency's decision about how to exercise its power. 467 U.S. at 843–44, 104 S.Ct. at 2781–82; *see also id.* at 865–66, 104 S.Ct. at 2793 (it is appropriate for an agency, not a court, to resolve "the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities").

In *Chevron,* the delegation of power to the agency was implicit; it was hypothesized from the text of an ambiguous statute. By contrast, the delegation of adjudicative authority to an agency that is empowered to hear disputes, receive settlement proposals, and enter binding orders is explicit—it closely resembles a direct congressional authorization to implement the provisions of a statute through regulations. In this case, for example, Congress has specifically delegated to the Commission a broad range of adjudicative powers over natural gas rates. All rates and charges must be filed with the Commission, 15 U.S.C. § 717c(c) (1982); the Commission is authorized to hold hearings on the lawfulness of those rates, either upon complaint by certain parties or on its own initiative, *id.* § 717c(e); the hearings are to be conducted in accordance with certain procedural restrictions, *id.* § 717n; and the Commission may fix those rates at a reduced level based on the findings it makes in those hearings, *id.* § 717d. In addition, Congress granted the Commission the broad power "to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders ... as it may find necessary or appropriate to carry out the provisions of this chapter [regulating natural gas rates]." *Id.* § 717*o.* As stated in *Chevron,* this explicit delegation of power to an agency compels a court to give deference to the agency's conclusions even on "pure"

questions of law within that domain. 467 U.S. at 843–44, 104 S.Ct. at 2781–82.[2]

We thus conclude that *Chevron* has implicitly modified earlier cases that adhered to the traditional rule of withholding deference on questions of contract interpretation. *See, e.g., Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 268–70, 80 S.Ct. 1122, 1125–27, 4 L.Ed.2d 1208 (1960) (upholding de novo review of an agency's interpretation of a contract). In *Texas Gas*, the Court upheld a de novo review standard where "the Commission professed to dispose of the case solely upon its view of the result called for by the application of canons of construction employed by the courts, and did not in any wise rely on matters within its special competence." *Id.* at 270, 80 S.Ct. at 1127. In *Chevron*, by contrast, the Court recognized that where Congress has made an explicit or implicit grant of power to an agency over certain matters, that grant of power embodies congressional recognition of the agency's "special competence" to handle those matters, and compels deference from the courts in reviewing how that power is exercised.[3] *See also Jewett v. Commissioner*, 455 U.S. 305, 318, 102 S.Ct. 1082, 1090, 71 L.Ed.2d 170 (1982) (canon of deference to agency's interpretation of its governing statute "is even more forceful" when applied to agency's interpretation of its own regulation).

Although we think *Chevron* principles alone compel this conclusion, there are other reasons for a court to defer to an agency's reading of a settlement agreement. One is the agency's greater expertise. As this court stated even before *Chevron*, "there is room, in review of administrative agencies, for some deference to their views even on matters of law like the meaning of contracts, as on the meaning of statutes, where the understanding of the documents involved is enhanced by technical knowledge of industry conditions and practices." *Columbia Gas Transmission Corp. v. FPC*, 530 F.2d 1056, 1059 (D.C.Cir.1976); *see also Gulf States Utils. Co. v. FPC*, 518 F.2d 450, 457 (D.C.Cir.1975) (deference is particularly appropriate where the question of interpretation is a technical one). Some courts have understood statements like this to imply that unless it is clear that the agency's interpretation rests on expert knowledge, no deference should be given. *See, e.g., Mid Louisiana Gas III*, 780 F.2d at 1243. We think that the better view, particularly in light of *Chevron*, is that deference should be given because the congressional grant of authority to the agency indicates that the agency's interpretation typically *will* be enhanced by technical knowledge. Construction of a settlement agreement will be influenced by the agency's expertise in the technical language of that field and by its greater knowledge of industry conditions and practices, including its more comprehensive experience with the kinds of disputes and negotiations that generally produce such an agreement. As this court has stated:

> Even assuming that the exercise we are here reviewing involves not policymaking but a search for the parties' contractual intent, that search nonetheless profits from familiarity with the field of enterprise to which the contract pertains. Whether interpretation of the present agreements raises an issue of law ... or an issue of fact, ... we would be foolish

**2.** This court has previously relied on this extensive delegation of authority by Congress in reviewing the Commission's interpretation of a tariff, stating that "FERC's order, like all Commission orders under the Natural Gas Act, is to be accorded a presumption of validity. *Permian Basin Area Rate Cases*, 390 U.S. 747, 767 [88 S.Ct. 1344, 1360, 20 L.Ed.2d 312] ... (1968)." *Consolidated Gas Transmission Corp. v. FERC*, 771 F.2d 1536, 1544 (D.C.Cir.1985).

**3.** The only obvious difference between interpretation of a settlement agreement and interpreta-

tion of a statute is that the agency is construing the statements and intentions of private parties rather than those made by the Congress. Yet the holding in *Chevron* rests not on the identities of the individuals whose intentions are in question, but on the fact that the governing statute explicitly or implicitly embodied Congress' decision to delegate authority to an agency over particular matters, thus compelling deference from the courts in reviewing how the agency exercised its authority on those matters.

not to accord great weight to the judgment of the expert agency that deals with agreements of this sort on a daily basis.

*Kansas Cities v. FERC*, 723 F.2d 82, 87 (D.C.Cir.1983) (citations omitted).[4]

A further reason, at least in this case, for this court to defer to the Commission's reading of this settlement agreement is that Congress required the Commission to take an active role in approving the agreement. Under the statute, the Commission is obliged to ensure that rates are not "unjust, unreasonable, unduly discriminatory, or preferential." 15 U.S.C. § 717d(a) (1982). In deciding to approve this settlement and enter it as an order, the Commission had to construe its provisions in light of the concessions each side had made. The Commission's view that NFGS failed to reserve any right to reprice its own gas production under the Act's ceiling prices for "first sale" gas may well have affected its determination that the specified rates were just and reasonable. *Cf. Swift & Co. v. Federal Maritime Comm'n*, 306 F.2d 277, 281 (D.C.Cir.1962) (agency "must be given reasonable leeway in delineating the scope of the agreement and therefore the extent of its prior approval" where the agreement "is not simply a private contract between private parties" but "existed legally only because approved by the [agency]"). A rule of deference by the courts will not work any great hardship on the parties to an agreement, but it will ensure that the Commission is established as the primary adjudicator in this field, as Congress intended.

There may, of course, be circumstances in which deference would be inappropriate. If the agency's interpretation of a contract has vacillated, deference might give the agency license to act arbitrarily by making inconsistent decisions without justification. *See, e.g., Tennessee Gas Transmission Co. v. FERC*, 789 F.2d 61, 62–63 (D.C.Cir.1986) (vacillation in agency rationale does not constitute reasoned decisionmaking); *cf. FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981) (consistency of an agency's interpretation of statute bears on the amount of deference given by courts). Or if the particular governing statute expresses Congress' intent that the courts should play a fully independent role in interpreting contracts in that field, the statute may indicate that no deference should be accorded to the agency's interpretation. *See, e.g., Local Union 1395, IBEW v. NLRB*, 797 F.2d 1027, 1030 (D.C.Cir.1986) (no deference where labor statutes explicitly give courts an independent role in interpreting collective bargaining agreements). In addition, if the agency itself were an interested party to the agreement, deference might lead a court to endorse self-serving views that an agency might offer in a post hoc reinterpretation of its contract. In this case, however, the Commission itself was not a party to the contract, though the Commission's staff actively participated in negotiating the settlement agreement between NFGS and the other interested parties. The Commission and its staff are not a single entity for all purposes; there is an obvious difference

---

**4.** The contrary argument might be that interpretation of a settlement agreement often may be a *peculiarly* legal task, and that deference is inappropriate because courts are *more* expert than agencies at interpreting such agreements. But aside from the points mentioned in the text, the major problem with this argument, once again, is *Chevron*. The same argument about the greater relative expertise of courts had been made frequently with respect to issues of statutory construction, *see, e.g., Hardin v. Kentucky Utils. Co.*, 390 U.S. 1, 14, 88 S.Ct. 651, 658, 19 L.Ed.2d 787 (1968) (Harlan, J., dissenting); *NLRB v. Marcus Trucking Co.*, 286 F.2d 583, 591 (2d Cir.1961) (Friendly, J.), but held no sway

with the Court in *Chevron*. We can see no relevant difference on this point between interpretation of a statute and interpretation of a settlement order. *See supra* note 3. Indeed, the Supreme Court's decision in *Texas Gas* had been cited in this circuit more often in cases involving interpretation of statutes, *see Office of Consumers' Counsel v. FERC*, 655 F.2d 1132, 1141 n. 21 (D.C.Cir.1980); *Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1027 (D.C.Cir.1978); *Lubrizol Corp. v. EPA*, 562 F.2d 807, 816 n. 23 (D.C.Cir. 1977), than in cases involving interpretation of contracts, *see Lowey v. Watt*, 684 F.2d 957, 965 (D.C.Cir.1982), though all of these cases predate *Chevron*.

between binding legal actions taken by the Commission, such as approval of a settlement order as "just and reasonable," and the everyday activities of its staff, such as assisting in the negotiations that helped fashion the settlement. In particular, the status of the Commission's staff as a "party" to the settlement negotiations does not make the Commission itself an interested party to the settlement contract.[5]

Our somewhat extensive discussion of the standard of review should not obscure our conclusion. We think that we are bound to give deference to the Commission's reading of the settlement agreement for Period II. But this is deference, not abdication. As in *Chevron*, if the intent of the parties on the particular issue is clearly expressed in the document, "that is the end of the matter." 467 U.S. at 842, 104 S.Ct. at 2781. We thus endorse the Fourth Circuit's view that a court need not accept "an agency interpretation that black means white. However, if the choice lies between dark grey and light grey, the conclusion of the agency, unmistakably possessed as it is of special expertise, in favor of one or the other will have great weight." *Consolidated Gas*, 745 F.2d at 291 (footnote omitted).

 In this instance, we find that the Commission's interpretation of the settlement agreement for Period II was both a reasonable reading and, indeed, a correct one. The Commission held that NFGS could not recover a retroactive rate increase for this period because in the settlement agreement NFGS failed to reserve any right to make such a recovery. We

agree. The settlement expressly stated that it resolved "all issues now pending before the Commission in the rate proceeding." Stipulation and Agreement of February 20, 1981, at 1, Appendix D to Brief of Petitioner at D–4. Those issues included all of the questions surrounding the proper valuation of NFGS's own gas production. As noted earlier, one of those questions was whether that gas would be valued on a cost-of-service basis or at some other rate; the parties agreed on cost-of-service valuation, and the Commission accepted that agreement when it entered its order approving the settlement. NFGS argues that it was bound to accept cost-of-service valuation of its own gas production under the Commission's regulations that were in effect at that time. This is not strictly correct, as we have pointed out, but it is true that those regulations were binding on NFGS insofar as at the time they prevented this gas from being valued as "first sale" gas. Nonetheless, that state of affairs did not prevent NFGS from reserving the right to seek adjustments if those regulations were later overturned by the courts. At the time this settlement agreement was negotiated and approved, the Act had been enacted and challenges to those regulations, as, for example, in the *Mid-Louisiana Gas* litigation, were already underway in the courts. Under these circumstances, it seems reasonable for the Commission to conclude that NFGS's complete failure to mention this issue constituted implicit acceptance of these rates as final and not subject to retroactive adjustment.[6]

---

5. It was suggested at oral argument that private parties will be less inclined to negotiate settlements with the Commission staff if courts later pay deference to the Commission's interpretation of the settlement. That concern is answered in part by the fact we have noted, that the staff and the Commission do not constitute a monolith. Agencies not infrequently reject or modify their staffs' positions. To the degree there is any substance to the expressed fear, private parties will simply have to be more cautious in agreeing to settlements. They should not tolerate ambiguities but, for example, must explicitly reserve rights they may wish to assert later. Doing so may cost them other concessions in the contract, but that merely

means they must pay a price for removing ambiguities at the outset rather than reserving them for litigation later. Indeed, if judicial deference to the Commission forces greater clarity in settlement agreements, with less subsequent litigation, efficiency will be increased for private parties as well as for the regulatory system.

6. NFGS also suggests that the Commission had given an assurance that retroactive rate adjustments could be made. The language of that "assurance" states only that if the regulations were overturned, "this Commission could authorize the collection of revenues denied by this

The only real difficulty with this reading of the settlement is posed by a general disclaimer that it contains, which states that "no party to this proceeding shall be deemed to have waived any claim or right which it may otherwise have with respect to any matters not expressly provided for herein." Stipulation and Agreement at 18, Appendix to Brief of Petitioner at D–21. This disclaimer, however, is insufficient to constitute an express reservation of a right to make retroactive adjustments in these rates. *See Mid Louisiana Gas III*, 780 F.2d at 1244. Nor does it shake our view that the Commission offered a reasonable interpretation of the agreement when it found that NFGS had failed to reserve this issue even by indirection. For one thing, the matter of how to value NFGS's own gas production *is* "expressly provided for" in the agreement. In addition, the disclaimer only preserves rights that NFGS "may otherwise have," but we have been unable to identify any other grounds for NFGS to claim such a right.

There is, however, a further and very important reason why the Commission was correct in concluding that NFGS had failed to reserve this right. The Commission's reading of the agreement is not only consistent with what the parties *purported* to do in the settlement, but it is strongly supported by what they *actually* did. On three separate occasions in this agreement, where NFGS wished to reserve the right to adjust its rates if specific contingencies occurred in the future, it explicitly reserved that right. The interest rate on refunds to NFGS's customers mandated in the agreement was made expressly contingent on the outcome of a case then pending in the Fifth Circuit Court of Appeals. Stipulation and Agreement at 6 n. 1, Appendix to Brief of Petitioner at D–9 n. 1. Also, if NFGS's income tax rates changed during the period covered by this settlement, its rates were to be adjusted accordingly. *Id.* at 12, Appendix at D–15. Finally, NFGS reserved the right to file appropriate adjustments in its rates if the Internal Revenue Service were to issue a ruling that might impair NFGS's ability to claim accelerated depreciation treatment on certain of its assets. *Id.* at 14–15, Appendix at D–17 to D–18. Each of these provisions demonstrates that NFGS knew how to reserve issues that had a bearing on the rates applicable to its own gas production, even if those reservations might cost them valuable benefits in the settlement negotiations. Together, they make it very difficult to read this agreement as reserving through silence the right to claim a retroactive adjustment on a prominent issue that was being fought out in the courts during the very period in which this agreement was reached. Such a reading would mean that silence and explicit reservation in the same document are to be given identical legal effect. *See also Consolidated Gas*, 745 F.2d at 289–90 (concluding on very similar facts that the explicit reservation of some cost issues in a settlement that did not mention the "first sale" issue implied that the latter issue was not reserved).[7]

provision through surcharges." Regulations Implementing the Natural Gas Policy Act of 1978, 6 F.E.R.C. (CCH) ¶ 61,077, at 61,151 (Jan. 29, 1979). This statement, however, does not obligate the Commission to authorize retroactive adjustments, but merely observes that the Commission *could* authorize such adjustments if it considered them to be appropriate.

7. Another relevant example of the underlying actions of the parties to a settlement, which the Fifth Circuit partly relied on in *Mid Louisiana Gas III* to find that a party did not waive its right to seek retroactive adjustments in its rates, is how much the issues resolved in the settlement agreement were worth relative to the value of the alleged concession. In that case, and similarly in the companion case, the court was unwilling to accept that a party would have waived its right to seek a retroactive adjustment by indirection when that concession was many times more valuable than the entire amount at stake in the agreement. *See Mid Louisiana Gas III*, 780 F.2d at 1245 (concession worth $9,000,-000 as opposed to settlement agreement involving only a $124,000 increase in rates); *Kentucky West Virginia Gas Co. v. FERC*, 780 F.2d 1231, 1236 (5th Cir.1986) (concession worth $60,000,-000 as opposed to settlement agreement involving only a $5,000,000 increase in rates). By contrast, the economics in this case are entirely credible: over nineteen months, the concession was worth about $8,000,000, *see* Brief of Petitioner at 6, as opposed to a settlement agreement that addressed NFGS's attempt to gain

## IV.

For all of the foregoing reasons, we conclude that the Commission correctly held that NFGS is not entitled to any retroactive adjustment in its rates for either Period I or Period II. The Commission's decision is therefore

*Affirmed.*

---

about a $28,000,000 increase in rates. *See* Stipulation and Agreement at 1, Appendix to Brief of Petitioner at D–4.