TM PRODUCTIONS, INC., Appellant,

v.

Frank M. NICHOLS, III, Appellee.

No. 19009.

Court of Civil Appeals of Texas, Dallas.

Oct. 7, 1976.

Tom Thomas, Kolodey & Thomas, Dallas, for appellant.

A. Don Crowder, David H. Cain, Crowder, Mattox & Morris, Dallas, for appellee.

CLAUDE WILLIAMS, Chief Justice.

Frank M. Nichols, III, recovered a judgment in the district court, based upon a jury verdict, against TM Productions, Inc. in his action to recover compensation for commissions alleged to be due him under his employment contract. TM Productions, Inc. appeals from this judgment and in its sole point of error contends that the court erred as a matter of law in granting appellee judgment for $9,200 based on the jury's answer to special issue number one because the proper construction of the written contract between the parties, under the uncontroverted evidence, would limit appellee's recovery to the sum of $1,408.55, the amount of commissions due him on the date of verdict. We hold that the trial court erred in rendering judgment on the verdict in the sum of $9,200 because there is no evidence to support it and we reverse the judgment of the trial court and render judgment for appellee Frank M. Nichols, III, against appellant TM Productions, Inc. in the sum of $1,408.55.

Nichols entered into a written contract with TM Productions, Inc. on September 21, 1973, in which Nichols was employed as a salesman in the business of supplying various productions services to radio stations across the country, such as radio station jingles, identification jingles, singing of call letters, and generally supplying tape recordings to be played on automated computer systems which replace manual operation of a radio station. Under this contract, Nichols was to be paid fifteen percent sales commissions on all products and services which he sold.

One type of contract called "The Producer" is a service containing production music in commercials that radio stations can use to underscore copy of a client or to produce a commercial which the station will sell to its local client. It is a format used by radio stations to increase advertising revenue and is sold to a radio station for a period of three years with payments being made to TM Productions on a monthly basis over thirty-six months. It constituted approximately ninety-five percent of Nichols' sales.

When the sale was finalized, TM Productions gave Nichols credit in a special bookkeeping account for amounts representing the first twelve months of the thirty-six month contract with the credit subsequently being posted for the remainder of the contract at the beginning of each following year. All amounts due Nichols were actually paid on a quarterly basis. Twenty-five percent of the first year's fifteen-percent commission was held in reserve by TM Productions in case of cancellation, or the like, but would finally be credited to Nichols upon completion of the contract. Nichols was given advances in the form of a draw against future commissions, including a travel allowance or draw. Nichols was notified on July 3, 1974, by telephone that he had been terminated effective June 30, 1974. In the ten-month period Nichols was employed by TM Productions, his advances totaled $17,241.60 and his total gross sales were estimated to be $200,000. To the best of Nichols' knowledge, no contract ever sold by him was canceled, defaulted or turned over to an attorney for collection.

It is undisputed by the parties that TM Productions owed Nichols at the time of trial a minimum of $1,408.55 which represents accrued commissions. However, Nichols argues that the contract states that upon his termination his account would be settled and he would be paid all commissions upon contracts which he sold and which had been billed and delivered to the purchaser. TM Productions argues that it is not obligated to pay future commissions until the amounts are actually received by it from the purchaser. TM Productions stipulates that it will pay Nichols the commissions when the payments are received from the purchasers.

Upon this disagreement, Nichols filed suit against TM Productions and alleged in his pleadings that the sums owed him were at least $9,500. He alleged a breach of contract on the part of TM Productions and sought an accounting in order to know what amounts were definitely owed him. Neither party pleaded that the contract was ambiguous and in fact in oral argument

before this court both parties agreed that they considered the contract definitely to be clear and unambiguous.

At the conclusion of the evidence the trial court submitted the following special issue.

Special Issue No. 1: What sum of money, if any, if paid now in cash, would reasonably compensate plaintiff, Frank M. Nichols, III, for money due him under the contract?

Answer in dollars and cents, if any, or none.

Answer: $9,200.

TM Productions moved the court to render the judgment *non obstante veredicto* for $1,408.55 in favor of Nichols because there were no proper pleadings and no evidence submitted to the jury upon which the findings on special issue number one could be supported. The trial court entered judgment for appellee Nichols on the jury's verdict awarding Nichols the sum of $9,200.

▮ Since TM Productions has not filed a motion for new trial, we are confined in our review to determine whether the trial court erroneously denied its motion for judgment *non obstante veredicto*. *Wagner v. Foster*, 161 Tex. 333, 341 S.W.2d 887, 890 (1960). Tex.R.Civ.P. 301 provides that a motion for judgment *non obstante veredicto* may be rendered by the court if a directed verdict would have been proper. Consequently, the trial court is authorized to render judgment *non obstante veredicto* only when there is no evidence warranting a submission of an issue to the jury. *Alamo Ambulance Service, Inc. v. Moulton*, 402 S.W.2d 200, 202 (Tex.Civ.App.—San Antonio 1966), *affirmed*, 414 S.W.2d 444 (Tex. 1967). Implicit in this rule is the fact that it is only when the issue is material that the judgment must conform to the findings. *Teas v. Republic National Bank*, 460 S.W.2d 233 (Tex.Civ.App.—Dallas 1970, writ ref'd n. r. e.); *Massie v. Hutcheson*, 270 S.W. 544 (Tex.Comm'n App.1925, jdgmt. adopted). An attack on the overruling of a motion for judgment *non obstante veredicto* constitutes a "no evidence" point as opposed to a point challenging the sufficiency of the evidence. *Shelton v. Ector*, 364 S.W.2d 425,

428 (Tex.Civ.App.—Dallas 1963, no writ). A "no evidence" point presents a question of law, and the appellate court must review the evidence most favorably in support of the findings to determine if a judgment *non obstante veredicto* is proper. *Muro v. Houston Fire & Casualty Insurance Co.*, 329 S.W.2d 326, 328 (Tex.Civ.App.—San Antonio 1959, writ ref'd n. r. e.). However, the rule providing that the court may render judgment *non obstante veredicto* if a directed verdict would have been proper, does not mean literally "no evidence at all" but comprehends those situations in which the evidence is deemed to be legally insufficient to establish an asserted proposition of fact. *Kirkpatrick v. Raggio*, 319 S.W.2d 362, 366 (Tex.Civ.App.—Fort Worth 1958, writ ref'd n. r. e.).

▮ In the light of these well-established rules, we must determine if there is any evidence of probative force upon which the jury could have based its findings on special issue number one. The primary evidence is the contract between the parties. Both parties agree that the written contract is a complete and unambiguous integration of their agreement. Of course, the question of whether a contract is ambiguous is one of law and not of fact. We have concluded, as a matter of law, that the contract is, indeed, unambiguous. Being unambiguous it would be inappropriate to permit parol evidence to support a construction of the agreement. As pointed out by Justice Guittard of this Court, in *Don Drum Real Estate Co. v. Hudson*, 465 S.W.2d 409 (Tex.Civ.App.—Dallas 1971, no writ), there is a distinction between "interpretation" and "construction" although these words are often used interchangeably. As stated in the opinion, "interpretation" of a contract is the process of determining the meaning of the language, whereas "construction" is the determination of the legal effects of the contract. Proof of extrinsic expression of the party's intention is proper for the interpretation of the language where the meaning is uncertain, but not for determining the contract's legal effect, except insofar as such determination requires

interpretation of the language used. In this case, we have an unambiguous contract, but the parties differ as to the meaning of the terminology utilized in the contract relating to the time to pay all accrued and future commissions. Appellee did not offer to introduce parol evidence to explain the provisions of the contract or his intentions when entering into the contract. Thus, we must look to the terms and provisions of the contract itself to determine whether appellant was obligated to pay all accrued and future commissions to the appellee upon termination of employment. The disagreement between the parties over the meaning of the contract revolves around the definition of two essential words.

One provision of the contract requires that within thirty days of the date the product is delivered and billed, TM Productions will *credit* Nichols' account for the first year's commission less a twenty-five percent reserve.[1] Nichols argues this word means a vested right in all commissions.

Another provision of the contract requires that in the event Nichols' employment is terminated by TM Productions, his account will be *settled* to the date of his termination.[2] Nichols argues this provision to mean that all vested commissions will be paid notwithstanding the fact that the purchase price has not been received by TM Productions.

A presumption exists that every provision of a contract was included for a particular purpose. *Jones v. Dumas Development Co.*, 229 S.W.2d 936, 939 (Tex.Civ.App.—Amarillo 1950, writ ref'd n. r. e.). A court must presume that the parties intended every word to have meaning, effect and purpose unless it is plainly repugnant to the meaning of the overall contract. *Masterson v. Gulf Oil Corp.*, 301 S.W.2d 486, 488 (Tex. Civ.App.—Galveston 1957, writ ref'd n. r. e.). In absence of evidence to the contrary, words and phrases in a written contract will be accorded the ordinary, popular, and commonly-accepted meaning. *Magnolia Warehouse & Storage Co. v. Davis & Blackwell*, 108 Tex. 422, 195 S.W. 184, 186 (1917); and *Pan American Insurance Co. v. Cooper Butane Co.*, 157 Tex. 102, 300 S.W.2d 651, 654–55 (1957).

In order to ascertain the commonly-accepted meaning of the two essential words, we must look to the dictionary. Webster's New International Dictionary of the English Language 621 (2d ed. 1941) defines the word "credit" within the bookkeeping context as follows:

> To enter upon the credit side of an account; to give credit for; to place to the credit of.

At 2293, it further defines the word "settle" as follows:

> To determine, as something exposed to doubt or question, to free from uncertainty or wavering; to make sure, firm or constant; as to settle questions of law; to put beyond dispute; as, that settles the question; also, to appoint definitely, as an event or date; as to settle a day for the meeting.

> To close by payment, as accounts; to liquidate.

In order to interpret this contract we must look to the entire contract to establish the meaning of individual provisions and the intent of the parties. *Portland Gasoline*

---

1. *The Producer. 15% after delivery and billing.* Within 30 days of the date the Producer is delivered and billed, TM will credit your account with the first year's commission less a 25% reserve. At 12 month intervals thereafter TM will credit your account with the commission for the next 12 month period. This procedure will be in effect for the duration of the contract. You will receive the 25% reserve as part of the final credit when the contract is totally fulfilled.

2. In the event your employment is terminated by either party, your account will be settled to the date of your termination. At the time of termination, you agree to return to TM, postage paid, any and all equipment, demonstration tapes, and any other material of any type or nature supplied to you by TM. Title to any equipment or material furnished to you shall remain in TM, and you have no ownership interest in any of this material. Either party may terminate this agreement upon 14 days written notice.

Co. v. Superior Marketing Co., 150 Tex. 533, 243 S.W.2d 823, 824–25 (1951). When the contract refers to "crediting" Nichols' account, it addresses the bookkeeping function that includes posting Nichols' account for the amount due that year only. Although this amount may be vested, any amounts derived from the second and third year of the contract would not vest until credited. When the contract refers to "settling" the bookkeeping account as of the date of Nichols' termination, it means only that the amounts credited to the account at that date will be paid and that Nichols will be advised of TM Productions' computations concerning what future amounts will be due him. It does not imply an accelerated payment of all commissions contrary to the contractual provisions providing for a credit to his account at the beginning of each year of the three-year contract and the final payment of the twenty-five percent reserve amount when the contract is totally fulfilled. Thus, the contract on its face provides no evidence with which to support the jury's verdict. Since no other evidence is available, the jury's verdict is without support, and appellant's no evidence contention must be sustained.

Accordingly, the trial court committed reversible error in entering judgment upon the verdict. We reverse the trial court's judgment and render judgment in favor of Nichols and against TM Productions, Inc. in the sum of $1,408.55, with interest thereon at the rate of nine percent per annum from March 12, 1976, being the date of the rendition of judgment by the trial court.

Reversed and rendered.