United States Court of Appeals,

Fifth Circuit.

No. 93-4089.

TENNESSEE GAS PIPELINE CO., Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

March 25, 1994.

Petition for Review of an Order of the Federal Energy Regulatory Commission.

Before JOHNSON, HIGGINBOTHAM, and EMILIO M. GARZA, Circuit Judges.

JOHNSON, Circuit Judge:

On April 8, 1991, Tennessee Gas Pipeline Company ("Tennessee") and Flagg Energy Development Corporation ("Flagg") entered into a firm natural gas transportation contract. Tennessee agreed to transport 4,140 dekatherms of natural gas each day from various points in and offshore Louisiana to Connecticut on Flagg's behalf. Tennessee also agreed to construct and operate the facilities necessary to transport the natural gas. Flagg agreed to pay Tennessee for its services.

Prior to entering into this contract, the Federal Energy Regulatory Commission ("FERC" or "the Commission") authorized Tennessee to charge Flagg certain rates for the transportation services. The Commission also ruled that Tennessee could later seek changes to those rates, as allowed by section four of the Natural Gas Act ("NGA"). Tennessee sought to change the rates on February 28, 1992. Flagg intervened and charged, among other things, that its gas transportation contract prohibited the type of

rate changes sought by Tennessee. The Commission agreed. Tennessee appeals. We reverse.

I. Facts and Procedural History

Tennessee entered precedent agreements with seven different companies in the winter of 1988-89. The companies proposed to pay Tennessee to transport natural gas to various points in the Northeast. Flagg entered such a precedent agreement with Tennessee on January 9, 1989. It desired for Tennessee to transport natural gas from various points in and offshore Louisiana to New Britain, Connecticut, and Bloomfield, Connecticut. Tennessee agreed to seek authorization from FERC to build the facilities necessary to transport that natural gas.

Consistent with the precedent agreements with the seven different companies—including its agreement with Flagg—Tennessee sought FERC approval to construct and operate new facilities which would expand the capacity of its existing pipeline system. The new facilities were to be located in five separate zones, which Tennessee designated Segments U, 1, 2, 3, and 4. In its application to FERC, Tennessee asserted that it would transport natural gas to Flagg through Segments U, 2, and 3 and would charge Flagg for the cost of operating those three facilities.[1] Rate

---

[1]There are two methods of charging for gas transportation: The "incremental cost allocation" method and the "rolled in" method. Under the incremental cost allocation method, the new customers pay for all of the costs of the new facilities. This method spares existing customers from having to pay for the expansion of the transportation system, even though they may use the expansion facilities. The rolled in method of charging for gas transportation requires each shipper—both old and new—to pay its share of the transportation costs based upon its

2

Schedule NET-EU set forth the rates which Tennessee proposed to charge. However, Tennessee requested permission to change the rates if all of the proposed facilities were not approved by October 1, 1989.

FERC approved the construction of three of the five Segments by May of 1990—Segments 1, 2, and 3. *See Tennessee Gas Pipeline Co.,* 51 FERC ¶ 61,113, 61,274, 61,275-276 and n. 22 (1990). Because FERC had not yet given Tennessee permission to construct the proposed facilities for Segments U or 4, it disapproved Tennessee's request to charge Flagg for any use of Segment U in a May 2, 1990, order ("May Order"). *Id.* However, the Commission decided that Tennessee could seek to amend its NET-EU rates to "roll in"[2] the costs associated with Segments U and 4 after those projects were approved and placed in service. The Commission asserted that Tennessee could seek such a rate change at a later date through a section 4 proceeding. *Id.* at ¶ 61,274. FERC calculated a rate for Segment 4 in its September 13, 1990, order. However, it again refused to compute a rate for Segment U because the proposed facilities had still not been approved. *Tennessee Gas Pipeline Co.,* 52 FERC ¶ 61,257, 61,930 (1990).

Based upon, and specifically referring to, the May Order, Tennessee and Flagg entered a Firm Natural Gas Transportation Agreement ("contract") on April 8, 1991. Tennessee agreed to

---

proportionate use of the facility in question. Tennessee proposed to charge Flagg under the incremental cost allocation method.

[2]*See supra* note 1.

construct the facilities needed to receive and deliver gas to Flagg. The specific rate formula for transporting the gas was set out in section 8.2 of the contract. However, section 8.4 of the contract provided that "pursuant to this Article VIII," Tennessee has the unilateral right "to file and make effective changes in the rates, charges, and conditions applicable to service."

Consistent with its construction of section 8.4 of the contract, Tennessee filed a limited rate case under section 4 of the NGA to revise the rates in its NET-EU schedule. Among other things, Tennessee sought to charge Flagg and another company, Capitol District Energy Center Cogeneration Associates ("Capitol District"), for their use of Segment U.[3] Apparently complying with the Commission's May Order, Tennessee proposed to roll the Segment U charge into these companies' gas transportation charges. *See* 51 FERC at ¶ 61,274 (deciding that "Tennessee may seek to amend its NET-EU rates to reflect the *rolling in* of all costs associated with various Northeast projects by initiating a section 4 proceeding after all the projects have been approved and placed in service" (emphasis added)).

Both Flagg and Capitol District filed motions to intervene.[4]

---

[3]Flagg and Capitol District are the only NET-EU customers which use Segment U. Tennessee uses that Segment to transport natural gas from the Gulf Coast approximately 1400 miles north to various points in the Northeast on Flagg's and Capitol District's behalf. Unlike the gas transported for Flagg and Capitol District, the natural gas transported for the other NET-EU customers is both received and delivered in the Northeast.

[4]Tennessee and Capitol District have settled their disputes in this matter.

Flagg proffered numerous objections to Tennessee's proposals. Important for our purposes, Flagg contended that its contract with Tennessee prohibited Tennessee from charging Flagg for its use of Segment U. According to Flagg, Tennessee could only charge for the use of Segments 2 and 3. Flagg requested FERC to review the matter in an expedited paper hearing, and FERC granted the request, limiting its review to deciding whether the Tennessee-Flagg contract precluded Tennessee from charging Flagg for its Segment U use. *Tennessee Gas Pipeline Co.,* 58 FERC ¶ 61,343 (1992). Finding the contract clear and unambiguous and basing its decision solely on the plain language of the contract, the Commission concluded that the contract did not allow Tennessee to charge Flagg for Segment U. *Tennessee Gas Pipeline Co.,* 60 FERC ¶ 61,261 (1992). The Commission denied Tennessee's motion for rehearing on January 21, 1993. Tennessee appeals.

## II. Discussion

*A. Background*

As late as the mid-1940s, just after World War II, contracts between natural gas companies (e.g., suppliers and transporters) and natural gas purchasers (e.g., public service commodity companies) began to take one of two shapes with respect to rates. The contracts either set forth a specific, unchangeable rate for natural gas supply or they set no specific rate whatever. *Compare United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956) *with United Gas Pipe Line Co. v. Memphis Light, Gas and Water Division,* 358 U.S. 103, 79 S.Ct. 194,

5

3 L.Ed.2d 153 (1958); *see also Federal Power Commission v. Sierra Pacific Power Co.,* 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956). As energy prices escalated, natural gas companies sought to unilaterally raise their prices by filing revised rate schedules with the, then, Federal Power Commission ("FPC").[5] Needless to say, the natural gas purchasers were less than pleased. They intervened in the section 4 proceedings and argued that the natural gas companies had no authority to unilaterally change their rates.

By the mid to late 1950s these controversies made their way to the United States Supreme Court. The first such case was *United Gas Pipe Line Co. v. Mobile Gas Service Corp.,* 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). There, United Gas Pipe Line Co. ("United") contractually agreed to furnish natural gas to Mobile Gas Service Co. ("Mobile") for a ten-year period at twelve cents per thousand cubic feet (MCF). *Id.* at 336, 76 S.Ct. at 376-77. Seven years into the agreement, United, without Mobile's consent, filed a new rate schedule with the FPC, raising the rates to fourteen and one-half cents per MCF. Mobile opposed the increase, arguing that it was contrary to the terms of its contract with United. United, however, contended that the NGA authorized natural gas companies to change their rate agreements unilaterally.

The Supreme Court disagreed. *Id.* at 337, 76 S.Ct. at 377. The Court found that the NGA evinced no intention to abrogate the rates set forth in private natural gas contracts. The Court found

---

[5]Section 4 of the NGA sets forth the procedures for changing rate schedules.

that the Act, instead, "expressly recognizes that rates to particular customers may be set by individual contracts." *Id.* at 338, 76 S.Ct. at 378. The primary focus, according to the *Mobile* Court, is the natural gas contract, not the Natural Gas Act:

> [E]xcept as specifically limited by the Act, the rate-making powers of natural gas companies [are] to be no different from those they would possess in the absence of the Act: to establish *ex parte,* and change at will, the rates offered to prospective customers; or to fix by contract, and change only by mutual agreement, the rate agreed upon with a particular customer.

*Mobile Gas Service Corp.,* 350 U.S. at 343, 76 S.Ct. at 380. The Court determined that preserving the integrity of natural gas contracts aided the stability of supply arrangements, contributed to the health of the natural gas industry, and therefore promoted the purposes of the NGA. *Id.* at 344, 76 S.Ct. at 380-81. It therefore ruled that the Natural Gas Act did not empower natural gas companies to unilaterally change their contracts. *Id.* at 337, 76 S.Ct. at 377.

The Supreme Court again emphasized the importance of contractual provisions in *United Gas Pipe Line Co. v. Memphis Light, Gas and Water Division,* 358 U.S. 103, 105, 79 S.Ct. 194, 195-96, 3 L.Ed.2d 153 (1958). Unlike the contract in *Mobile,* which set forth a specific gas rate, the contract in *Memphis* required Memphis Light, Gas and Water Division ("Memphis") to pay United in accordance with United's rate schedule "or any effective superseding rate schedules[ ] on file with the" FPC. *Memphis Light, Gas and Water Division,* 358 U.S. at 105, 79 S.Ct. at 196. In effect, Memphis bound itself to paying the "going" rate for the

7

gas.  *Id.* at 110, 79 S.Ct. at 198.  In accordance with the United-Memphis contract, United sought to raise the gas supply rates it charged by filing revised rate schedules with the FPC.  Memphis protested.  Viewing *Mobile* as a sword—prohibiting natural gas companies from *ever* seeking unilateral rate revisions—Memphis contended that United's efforts ran afoul of the Supreme Court's decision in *Mobile.  Id.* at 108, 79 S.Ct. at 197.

The Supreme Court read its *Mobile* decision otherwise.  Again focussing on the language in the contract, the *Memphis* Court ruled that a natural gas company is precluded from seeking unilateral changes in its rates *only* if its contract *expressly* precludes such changes.  *Id.* at 113, 79 S.Ct. at 200.  According to the *Memphis* Court, a gas company, "like the seller of an unregulated commodity, has the right in the first instance to change its rates *as it will,* unless it has undertaken by contract *not* to do so." *Id.* (Emphasis added).  As made clear in *Mobile* and *Memphis,* courts deciding whether a natural gas company may unilaterally change its rates must focus on the words of the natural gas contract.

*B. Standard of Review*

In light of *Mobile* and *Memphis,* we now turn to the firm natural gas agreement at issue in the case *sub judice.*  Flagg asks the Court to defer to FERC's construction of that agreement.  This, we cannot do.  It is well-settled in the Fifth Circuit that this Court will review the construction of natural gas contracts freely. *El Paso Natural Gas Co. v. Federal Energy Regulatory Commission,* 881 F.2d 161, 164 (5th Cir.1989);  *Pennzoil Co. v. Federal Energy*

*Regulatory Commission,* 789 F.2d 1128, 1135-36 (5th Cir.1986). This Court will not defer to FERC's construction of such contracts unless FERC relied on its factual or technical expertise in reaching its conclusions. *Mid Louisiana Gas Co. v. Federal Energy Regulatory Commission,* 780 F.2d 1238, 1243 (5th Cir.1986); *see also El Paso Natural Gas,* 881 F.2d at 164 (stating that "where the understanding of the problem is enhanced by the agency's expert understanding of the industry, this Court *may* defer to the views of the agency although those views are not conclusive" (emphasis added; internal quotations omitted)). In the case *sub judice,* the Commission relied solely on the words of the contract. This Court will therefore review the construction of the gas transportation agreement *de novo.*

*C. Interpreting the Contract*

In interpreting a natural gas contract, courts should apply the normal rules of contract interpretation. *Mid Louisiana Gas,* 780 F.2d at 1242-43. In section 16.4 of their contract, Flagg and Tennessee agreed that the Texas rules of contract interpretation would control in any contract disputes. A cardinal rule of contract interpretation in Texas requires courts to review the entire contract in order to determine its meaning; courts should not consider any single provision in isolation. *Eagle Life Insurance Co. v. G.I.C. Insurance Co.,* 697 S.W.2d 648, 650 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). To the contrary, the goal of contract interpretation is to determine the parties' intentions by harmonizing and giving effect to each provision

9

within the contract such that none is rendered meaningless. *Railroad Co. v. Androscoggin Mills,* 89 U.S. (22 Wall.) 594, 22 L.Ed. 724 (1874); *Woods v. Sims,* 154 Tex. 59, 273 S.W.2d 617, 620-21 (1954); *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 158 (1951); *Eagle Life Insurance Co.,* 697 S.W.2d at 650; *see also Duracon, Inc. v. Price,* 817 S.W.2d 147, 149 (Tex.App.—El Paso 1991, writ denied) (stating that courts are to presume that the parties intended every clause to have some effect). Not only must courts give meaning to each *provision,* courts must also give meaning, effect, and purpose to every *word* in the contract, if at all possible. *TM Productions, Inc. v. Nichols,* 542 S.W.2d 704, 708 (Tex.App.—Dallas 1976, writ ref'd n.r.e.).

The starting place for construing a contract is its language. *Mid Louisiana,* 780 F.2d at 1243. The provisions in dispute here are located in Article VIII, which is entitled "*Rates For Service.*" The most important of those provisions for our purposes are sections 8.2 and 8.4. Those sections are the second and fourth paragraphs in Article VIII. They provide the following:

> 8.2 *Transportation Rates*—Beginning on the Commencement Date, the compensation to be paid by Shipper to Transporter for the transportation service provided for herein shall be payable monthly in accordance with Article X hereof and shall be equal to the sum of the following: (a) the product of (1) the sum of the "D-1" charges for Segments 2 and 3 under Transporter's NET-EU Rate Schedule and (2) the Transportation Quantity, (b) the product of (1) the sum of the "D-2" charges for Segments 2 and 3 under Transporter's NET-EU Rate Schedule and (2) the "D-2 Billing Determinant" for the applicable billing period as set forth in Exhibit B hereto, (c) the product of (1) the sum of the "Commodity" charges for Segments 2 and 3 under Transporter's NET-EU Rate Schedule and any applicable surcharges as included in Transporter's effective FERC Gas Tariff and (2) the quantity of gas delivered by Transporter to Shipper during the applicable billing period.

References herein to Transporter's NET-EU Rate Schedule shall include any successor or substitute rate schedules....

8.4 *Rate Changes*—Shipper agrees that Transporter shall have the unilateral right *pursuant to this Article VIII* to file and make effective changes in the rates, charges, and conditions applicable to service pursuant to the Rate Schedule under which this service is rendered and/or any provisions of the General Terms and Conditions of Transporter's FERC Gas Tariff Volume No. 1 as such Tariff may be revised or replaced from time to time. Without prejudice to Shipper's right to contest such charges, Shipper agrees to pay the effective rate for service rendered pursuant to this Agreement, subject to FERC review and adjustment. (Emphasis added).

*1. FERC'S Construction*

Reviewing section 8.2, the Commission correctly determined that that section requires Flagg to compensate Tennessee according to a set formula which includes variables for Demand ("D-1" and "D-2") and Commodity charges for Segments 2 and 3. The Commission also determined that section 8.4 "arguably does give[ ] Tennessee the right to unilaterally file changes to two parts of its tariff: the rates, charges, and conditions for the service ... and the tariff's general terms and conditions." 60 FERC at ¶ 61,865. However, the Commission determined that the emphasized portion of section 8.4—"pursuant to this Article VIII"—limited Tennessee's right to file revised rates. According to the Commission, any changes under section 8.4 must be consistent with section 8.2. Since section 8.2 allows Demand and Commodity charges solely for Segments 2 and 3—not for Segment U—the Commission concluded that adding charges for Segment U is inconsistent with section 8.2. The Commission therefore ruled that the "pursuant to" phrase prohibited Tennessee from unilaterally adding a Segment U charge for the NET-EU service. *Id.* In essence, the Commission decided that section

11

8.4 allows for changes in Segments 2 and 3 charges only.

Here, on appeal, FERC adds that the definition of "pursuant to" supports the Commission's conclusion. FERC asserts that "pursuant to" is a restrictive phrase which means "in conformance to or agreement with" or "according to." FERC quotes BLACK'S LAW DICTIONARY as providing that "when [the words "pursuant to' are] used in a statute ... [they constitute a] restrictive term." FERC's Brief at 22-23 (quoting BLACK'S LAW DICTIONARY 1236 (6th ed. 1990)).

We disagree with both the Commission's construction of the contract and FERC's interpretation of the "pursuant to" language. In our view, the construction proffered by FERC effectively deletes section 8.4 from the contract. Section 8.2—even absent the language in section 8.4—authorizes Tennessee to unilaterally change the costs associated with Segments 2 and 3. Section 8.2 sets forth a formula for charging for the use of Segments 2 and 3. That formula includes four variables—D-1 charges, D-2 charges, Commodity charges, and a D-2 Billing Determinant. The dollar amount for each variable is set out, not in the contract, but in the NET-EU Rate Schedule. Hence, a unilateral change in the NET-EU Rate Schedule, which is expressly permitted by section 8.2,[6] changes the dollar

_____

[6]The second paragraph in section 8.2 states that references to the NET-EU Rate Schedule "shall include any successor or substitute rate schedules." That language is strikingly similar to the provision which was at issue in *Memphis.* There, the contract provided that "[a]ll gas delivered hereunder shall be paid for by Buyer under Seller's Rate Schedule ... *or any effective superseding rate schedules.*" 358 U.S. at 105, 79 S.Ct. at 196 (emphasis in the original). The Supreme Court ruled that that language authorized the Seller to unilaterally change the rates. *Id.* at 110, 79 S.Ct. at 198-99.

12

amount of each variable. A change in the variable amounts necessarily changes the charges for Segments 2 and 3. Hence, under the Commission's construction, section 8.4 is mere surplusage. The Commission's construction gives section 8.4 no independent meaning of its own. Section 8.4 simply mimics section 8.2; it adds nothing to the contract.

FERC's restrictive definition of "pursuant to" likewise eviscerates section 8.4 from the contract.[7] In FERC's view, the first sentence in section 8.4 allows Tennessee to change the rates and charges as long as those changes are "in agreement with" section 8.2. This argument, when taken to its logical conclusion is nonsensical, for absent section 8.4, the rate formula outlined in section 8.2 can *never* change. Yet, under FERC's construction, absent a change in section 8.2, Tennessee cannot exercise its right to change section 8.2. In other words, section 8.2 has to first change before it can *be* changed. If it does not change on its own, it cannot *be* changed under the authority of section 8.4. This construction not only make no sense, but it also negates section 8.4: It, in effect, requires the rate formula to remain constant, since section 8.2 clearly cannot change on its own. Thus, the section 8.4 language which provides Tennessee with the right to make unilateral changes in the transportation rates is, again, rendered meaningless and ineffective. Such a construction clearly

---

[7]We also note that the restrictive definition proffered by FERC is inapplicable in this case. BLACK'S LAW DICTIONARY makes clear that the "pursuant to" phrase is restrictive "when used in a *statute*." BLACK'S LAW DICTIONARY 1237 (6th ed. 1990) (emphasis added). A contract—not a statute—is at issue here.

13

violates the elementary rules of contract interpretation which require courts to give meaning to each term, phrase, and provision of a contract. *See Androscoggin Mills,* 89 U.S. (22 Wall.) 594, 22 L.Ed. 724 (1874) (requiring courts to give effect to all of a contract's provisions); *TM Productions, Inc.,* 542 S.W.2d at 708 (stating that courts must give effect and purpose to each word in a contract).

Our construction of the contract does not violate these contract interpretation rules. This Court's review of the contract reveals a more coherent interpretation, one which gives meaning and effect to both section 8.2 *and* section 8.4. Another interpretation of the "pursuant to" phrase aids in our task. WEBSTER'S NEW COLLEGIATE DICTIONARY and BLACK'S LAW DICTIONARY first define "pursuant to" as meaning "in carrying out" or "in the course of carrying out." WEBSTER'S NEW COLLEGIATE DICTIONARY 930 (1979); BLACK'S LAW DICTIONARY 1237 (6th ed. 1990). Using this definition, the pertinent sentence in section 8.4 provides Tennessee with the unilateral right, *in carrying out* Article VIII, to file and make effective changes in the transportation rates. Because Article VIII establishes Tennessee's authority to charge Flagg for the gas transportation, Tennessee "carries out" the terms of Article VIII by charging Flagg. Hence, section 8.4 simply provides Tennessee with the right to change transportation rates when *carrying out* its charging authority.

Our construction of section 8.4 is consistent with other provisions in the contract—section 16.1, in particular. Section

14

16.1 prohibits the modification of *any* of the terms of the contract absent written consent by both parties.  By using the "pursuant to this Article VIII" language in section 8.4, the parties completely removed Article VIII from the ambit of section 16.1.  The parties provided that *contrary* to the modification prohibition in section 16.1, unilateral changes in Article VIII *are* permissible.

## 2. Flagg's View

Flagg offers a second interpretation of the contract.  It contends that the terms "rates" and "charges" are used synonymously in section 8.4 and are distinct from the terms "cost allocation"[8] and "compensation," terms which refer to the amount Flagg owes to Tennessee for the gas transportation.  Using this reading of the contract, Flagg reaches FERC's conclusion:  while Tennessee may revise the "charges" for Segments 2 and 3, Tennessee may not change the overall gas transportation rates by, for example, including charges for Segment U.

Besides completely negating the effect of section 8.4, as discussed in part II(C)(1) of this opinion, Flagg's construction improperly renders the word "rates" superfluous.  *Fort Worth Lloyds Insurance Co. v. Willham,* 406 S.W.2d 76, 79 (Tex.Ct.Civ.App.—Amarillo 1966) (stating that "courts are without authority to needlessly reject any words or terms used in contracts by the parties or delete any clause therein as surplusage, unless such action is judicially mandatory").  A careful reading of the contract reveals that the words "rates" and "charges" are used

---

[8]The term "cost allocation" is not used in the contract.

distinctly. Section 8.2 associates the word "charges" with specific costs connected with three of the four NET-EU variables. That section provides for "D-1 *charges*," "D-2 *charges*," and "Commodity *charges*." (Emphasis added; internal quotation marks omitted).

The word "rates" is used more globally. That word is used just four times in the contract. Section 8.4 is entitled "*Rate* Changes," and it provides Tennessee with the "unilateral right ... to file and make effective changes in the *rates*." Article VIII is entitled "*Rates* For Service," and section 8.2 is entitled "Transportation *Rates*." The word "rates," as used in these latter two locations, alludes, not to the Demand and Commodity variables—as does the word "charges." Using the ordinary meaning of the word and construing "rates" in the context of the entire contract, we find that that word means the overall price for the gas transportation.[9] The word "rates" found in section 8.4 necessarily has the same definition as does the word "rates" found in the title to Article VIII and in section 8.2. *See Gonzalez v. Mission American Insurance Co.,* 795 S.W.2d 734, 736 (Tex.1990) (deciding that in general, a word which is used in one sense in one part of a contract is presumed to retain that same meaning throughout the contract, absent indications to the contrary);

---

[9]Indeed, WEBSTER'S NEW COLLEGIATE DICTIONARY defines "rate" as "a charge, payment, or price fixed according to a ratio." WEBSTER'S NEW COLLEGIATE DICTIONARY 950 (1979). Flagg is therefore correct in arguing that the term "rates" is not synonymous with the term "compensation." Although the amount of compensation equals the transportation rates, "compensation" refers to the amount Flagg owes Tennessee, not the price of the transportation services.

*Johnson v. Dick,* 281 S.W.2d 171, 175 (Tex.Ct.Civ.App.—San Antonio 1955) (same); *Green Avenue Apartments, Inc. v. Chambers,* 239 S.W.2d 675, 685 (Tex.Civ.App.—Beaumont 1951) (same). Thus, in authorizing Tennessee to change the "rates," section 8.4 gave Tennessee the authority to completely revise the prices for its gas transportation services. Tennessee's right to make such revisions is limited only by procedural and other requirements in the Natural Gas Act. *Memphis,* 358 U.S. at 110, 79 S.Ct. at 198-99.

Flagg contends that such an interpretation fails to consider the technical manner in which the term "rates" is used and renders section 8.2 nugatory. Neither argument is persuasive. First, the contract does not indicate that the word "rates" is used in any technical sense. In fact, FERC, itself, used the term "rates" as meaning the total costs for the gas transportation throughout the course of this controversy. *See, e.g.,* 60 FERC at ¶ 61,863 (stating that "Tennessee filed a general rate case ... seeking to increase the *rates for most of its services*"); *Tennessee Gas Pipeline Co.,* 59 FERC ¶ 61,175 (1992) (stating that "the Commission rejected Tennessee Gas Pipeline Company's ... proposal to increase its *rates for transportation services under Rate Schedule NET-EU*"); *Tennessee Gas Pipeline Co.,* 58 FERC ¶ 61,343 (1992) (asserting that Tennessee "filed a limited rate case proposing to increase *Rate Schedule NET-EU rates*"); *Tennessee Gas Pipeline Co.,* 58 FERC ¶ 61,160 (1992) (stating that Tennessee "filed a tariff sheet reflecting increased *rates for transportation service rendered under its Rate Schedule NET-EU*") (emphasis added).

17

Second, this Court's construction of section 8.4 does not make section 8.2 meaningless.  This Court's construction of the contract simply makes the authority of section 8.2 temporary.  The clear intent of the parties, as revealed in the contract, was that the specific rate guidelines set forth in section 8.2 would be viable only until Tennessee chose to revise the transportation rates in a manner consistent with the NGA.

In this case, Tennessee has filed revisions to its NET-EU Rate Schedule to include charges for Segment U.  This Court does not determine whether those revisions are consistent with the NGA, nor has it been asked to do so.  However, a clear reading of the gas transportation contract at issue here reveals that the Flagg-Tennessee agreement unambiguously authorizes Tennessee to file such unilateral changes.  Any other reading would impermissibly negate portions of the contract.[10]

### III. Conclusion

For the aforementioned reasons, this Court REVERSES the decision of the Federal Energy Regulatory Commission.

---

[10]Tennessee has presented numerous other arguments and counter-arguments in support of its position.  In light of our construction of the contract here, we need not address those arguments.